NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 15, 2016
Decided December 23, 2016

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 15-3851

| | |
|---|---|
| SCOTT J. RETZLOFF, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 14-cv-765-jdp |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, *Defendant-Appellee*. | James D. Peterson, *Judge*. |

**O R D E R**

Scott Retzloff is seeking Disability Insurance Benefits from the Social Security Administration; his application relies primarily on a back injury and associated complications and pain. So far, he has failed to persuade the relevant adjudicators that he meets the criteria for these benefits. After the district court upheld the decision of the administrative law judge (ALJ), acting for the Social Security Administration, he brought this appeal, in which he argues that the ALJ erred by refusing to give controlling weight to his treating physician's opinions about his residual functional capacity. We conclude, however, that substantial evidence supports the ALJ's assessment of the medical opinions, and so we affirm the denial of benefits.

**I**

Retzloff was working at a bait shop when, on August 7, 2009, he fell from a truck and landed on his back on a log. A spinal x-ray at the emergency room revealed a possible small lumbar compression fracture with marginal spurring. The ER doctor cleared him to return to work after three days and sent him home with prescription pain medications and instructions not to lift anything until the pain went away. A few days later, Dr. Brent Kelley ordered an MRI, which ruled out the suspected compression fracture but showed lumbar disc desiccation in several places and some bulging in that area. The desiccation (*i.e.* drying) and bulging are common signs of incipient degenerative disc disease. The MRI also showed borderline central spinal stenosis (that is, narrowing of the spinal canal). Importantly, although the fall led to the discovery of these conditions, there is no medical evidence that it *caused* them, aside perhaps from the fact that Retzloff had not suffered from back issues before the fall. When Dr. Kelley saw him two weeks after the accident, he was no longer taking pain medication and he reported that his back was 80% improved. Dr. Kelley released him to work without restrictions.

From October through December 2009, Retzloff attended physical therapy sessions, which he found helpful. He told the therapist in December that he felt "no pain unless he does something like twisting." His report to Dr. Kelley, however, was not so positive. At a November 2009 appointment, he acknowledged improvement but also said that he had greater back pain after prolonged standing or walking. Dr. Kelley accordingly restricted him to medium work with a 20-pound lifting restriction. After a December visit, Dr. Kelley wrote that overall Retzloff's back pain was not so bad and that the physical therapy was working. The doctor also noted that Retzloff was "quite insistent on his work ability for the future." This may have meant the *lack* of any such ability, because Dr. Kelley referred Retzloff to Dr. Andrew Floren, an occupational medical specialist, with a note to Dr. Floren saying that Retzloff "may be interested in getting a permanent partial disability rating if this is possible."

Retzloff followed up with Dr. Floren in February 2010. At that time Dr. Floren recorded that Retzloff had been fired from his job on September 1, that he had failed to secure worker's compensation benefits, and that he was "currently in litigation." Retzloff appeared angry and said that he was in a "great deal of pain." He complained that nothing helped his back pain, which he now described as a right-side aching, burning sensation, of a severity of anywhere from 2 to 8 on a 10-point scale, radiating from the lower to the mid-back. For all that, Retzloff was taking only ibuprofen or aspirin for his pain, and Dr. Floren detected only "mild to moderate tenderness" in the

lower back. A neurological exam came back as normal, but even so, Dr. Floren concluded that Retzloff had "40% reduced motion" in his lower back. After ordering more tests, Dr. Floren cleared Retzloff to work on a regular schedule with only the restrictions Dr. Kelley had imposed. In early March 2010, Dr. Floren relaxed those restrictions; a new MRI and bone scan, along with his review of a CT scan taken in November 2009, persuaded him that Retzloff could lift up to 40 pounds. He saw only mild tenderness in the spine and good, painless motion in the back. Retzloff, he concluded, had longstanding degenerative changes that had been exacerbated by the fall, but all that could be done was to continue the physical therapy.

Even with more physical therapy, Retzloff saw no improvement. In April 2010 Dr. Floren noticed a mild antalgic (pain-avoiding) posture when Retzloff stood. The doctor recommended that Retzloff use a TENS unit, limit lifting to a maximum of 25 pounds, and only occasionally bend, stoop, or twist. Matters were not much better in May. Retzloff then turned to a spine specialist, Dr. Kay Krave. His complaints to her were essentially unchanged. Dr. Krave recommended therapy. At the same time, Retzloff turned down Dr. Floren's suggestions of steroid injections or surgery. He reported that he had been moving to a new house the day before and was experiencing increased pain. Dr. Floren noted that Retzloff had only a mild antalgic posture, but he continued to think that the 25-pound lifting restriction and only rare bending, stooping, twisting, and climbing were needed. Retzloff saw a physical therapist once in May 2010 and went to a chiropractor a few times.

Retzloff reported worsening pain in June. He told Dr. Floren that he had a "significant stabbing numb sensation down his left leg into his foot" and his aching, burning pain continued in his low back but now radiated down his leg. Dr. Floren's exam revealed a new weakness in Retzloff's hips and quadriceps, which Retzloff blamed on the chiropractor. Dr. Floren recommended another MRI, which showed (as before) an annular tear at one level, disc degeneration at two levels, degenerative changes of the sacroiliac joints, mild spine narrowing from disc bulging, degenerative hypertrophic facet changes, and a congenitally small spinal canal.

In July 2010 a surgeon, Dr. Eduardo Perez, concluded that Retzloff was not a good candidate for surgery, despite the worsening pain. Dr. Perez noted that Retzloff had negative straight leg raising, full strength in his lower extremities, tenderness to palpitation in his low back, symptomatic flexion and extension. He also had positive Waddell's signs (that is, signs that the pain may have had a psychological origin). Retzloff was "somewhat despondent" at his visit with Dr. Floren the next day. His pain, which he treated with two daily doses of Aleve, was worse with activity. He reported

that he could lift two gallons of milk and walk about a mile without increased pain. Dr. Floren observed an antalgic gait and posture, mild to moderate tenderness in the low back, 70 degrees of forward motion, 15 degrees of extension, and 15 degrees of bilateral flexion. The doctor reviewed treatment options with Retzloff, but Retzloff rejected both surgery and prescription pain medication. Dr. Floren then imposed several permanent work restrictions: no lifting over 20 pounds; rare bending; occasional kneeling, squatting, crouching, twisting, climbing, and overhead reaching; no continuous forward reach; no continuous sitting; standing and moving around as needed; and no standing or walking more than 20 minutes per hour. In August 2010—a critical date for the ALJ—Dr. Floren indicated on a worker's compensation form that Retzloff had a 12% disability. He limited Retzloff to light work, with restrictions consistent with his earlier order. After that August 2010 visit, Retzloff had no treatment for his back pain for the next year and a half. He did, however, visit doctors for other purposes. Twice during those visits he was observed to have a normal gait.

Retzloff next saw Dr. Floren in April 2012. Retzloff said that he had been looking for work, but no one would hire him. He mentioned that he had applied for Social Security disability benefits with a lawyer's help. He reported that he could not sit or stand more than 10 to 15 minutes without stretching, he had a hard time doing the dishes or walking, and he still treated his pain with Aleve. Dr. Floren suggested steroid injections, and Retzloff consented. Although Retzloff displayed several signs of back problems, he had a normal neurological exam and good strength in his lower extremities. Dr. Floren recommended another MRI and bone scan and told Retzloff he should stay off work. The MRI revealed no significant changes. In June Retzloff returned to Dr. Floren, who again recommended steroid injections and that Retzloff remain off work.

Before Retzloff's next visit to Dr. Floren, in November 2012, he apparently saw another doctor. But at the November 2012 visit he told Dr. Floren that he was waiting for approval for the steroid injections. Dr. Floren noted that Retzloff could not find light work and was "fairly frustrated obviously with the situation." His complaints were largely unchanged: pain ranging from 2 to 7, for which he took Aleve almost daily. After this Dr. Floren did not see Retzloff again, but in March 2013 he completed a worker's compensation form indicating that Retzloff could not work at all. In May 2013 he completed a medical statement that referred back to his June 2012 note.

## II

In the meantime, Retzloff had applied for Social Security disability benefits in June 2011. The agency found him not to be disabled and denied both his application

and his request for reconsideration. He then requested a hearing before an ALJ, which he received in June 2013. There he testified that he had been unable to find work because employers were not hiring or would not accommodate his disability. He said that his back injury had progressively worsened since his injury in August 2009. When asked about his symptoms, Retzloff said that he had sharp pain in his lower back and weakness in his legs. He could sit for up to 1 hour, stand for 15 to 20 minutes, and walk for around 100 yards; he struggled to do the dishes and vacuum. Still he was taking only nonprescription medications, although he was trying to get injections too. Finally, Retzloff testified that his previous jobs involved heavy lifting that he no longer could do. A vocational expert testified that if Retzloff was limited to light work with only occasional climbing of ramps and stairs and occasional balancing, stooping, crouching, kneeling, and crawling, he no longer could perform his previous jobs, but there were jobs in the national economy that he could do. Such jobs were not available for someone who could lift no more than 20 pounds occasionally and just 10 pounds frequently, sit for 5 hours maximum a day, and rarely bend, squat, or climb.

In September 2013 the ALJ denied Retzloff's application for benefits. Applying the required 5-step analysis, see 20 C.F.R. §§ 404.1520(a), 416.920(a), the ALJ found that Retzloff had not engaged in substantial gainful activity since the alleged onset (Step 1); that his chronic mechanical low back pain with annular tear, spondylolisthesis, moderate degenerative joint findings, and mild to moderate stenosis was a severe impairment (Step 2); that his impairment did not meet or equal a listed condition (Step 3); that he was unable to perform his past work (Step 4); and that he still could work as a bench assembler, parking lot cashier, or warehouse checker (Step 5).

In determining Retzloff's residual functional capacity, the ALJ acknowledged Retzloff's testimony that he could not work because of constant low back pain, which affected most of his movements. But, the ALJ reasoned, the objective medical evidence undercut this account. He noted that although the initial x-ray showed a possible compression fracture, later diagnostic tests ruled out a fracture and disclosed only mild congenital and degenerative conditions which remained stable from August 2009 to May 2012. Retzloff's physical examinations were similarly unremarkable. The ALJ inferred that Retzloff's minimal treatment belied his assertion of disability.

The ALJ recognized that after a year and a half, Retzloff sought additional medical treatment in January 2012. Nothing much had changed by then, however. Overall the ALJ thought that the "significant gap in medical treatment, followed by minimal findings on physical examinations, stable imaging findings, conservative treatment recommendations, and lack of follow-up with recommended treatment, is

entirely inconsistent with ongoing disabling pain, or worsening pain." Similarly, the ALJ concluded that Retzloff's daily activities did not suggest disabling pain. Indeed, the ALJ found his reports contradictory. On the one hand, Retzloff said that he was unable to help with even the simplest chores without excruciating pain, but on the other hand, he sought very little medical help and limited himself to over-the-counter medication.

The ALJ gave substantial weight to Dr. Kelley's early opinions and Dr. Floren's opinions up to April 2010 because those opinions were consistent with the doctors' objective findings and otherwise supported by the record. The ALJ was skeptical about Dr. Floren's decision in May 2010 to change Retzloff's restrictions to rare bending, stooping, twisting, or climbing, even though the only exam findings were mild antalgic posture and low back tenderness. Dr. Floren's decision in July 2010 to limit Retzloff further to lifting 20 pounds; rare bending; occasional kneeling, squatting, crouching, twisting, climbing, or reaching overhead; only 20 minutes of standing or walking every hour; and frequent sitting was similarly hard to justify. Dr. Floren had found only "antalgic gait and posture, mild to moderate back tenderness, and reduced motion of the lumbar spine." In August, Dr. Floren concluded that Retzloff was ready for light work, but limited him to 3 to 5 hours of sitting a day with rare bending, squatting, and climbing. The ALJ did not give these opinions substantial weight. Likewise the ALJ gave little weight to Dr. Floren's March and May 2013 opinions. On those occasions, Dr. Floren had said that Retzloff could not work because of his low back pain, but he did not conduct a physical examination and instead referred back to his June 2012 treatment note. Yet that examination reflected findings of only "mild" conditions and the recommended treatment was Aleve and a TENS unit.

The ALJ reviewed the opinions of the consulting physicians and found them lacking, too. Both doctors had opined that Retzloff could perform light work without restrictions. But the ALJ believed that Retzloff did need some postural restrictions and adopted several of Dr. Floren's suggestions that were supported by the record. The ALJ also noted that Retzloff had not tried to work since his accident and had been on unemployment compensation in 2010 and 2011. He also had a worker's compensation claim that apparently had settled. Retzloff had told Dr. Floren numerous times that he could not find any light-duty work. In the ALJ's view, this suggested that "factors *other than* the claimant's severe physical impairments have interfered with his return to any work." The ALJ concluded, based on a vocational expert's testimony, that jobs exist in the national economy for someone with Retzloff's limitations, and thus he was not disabled. The Appeals Council denied review, and so the ALJ's decision stands as the final decision of the agency. See *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016).

## III

On appeal Retzloff challenges only the ALJ's refusal to give controlling weight to Dr. Floren's post-April 2010 opinions. Retzloff asserts that the ALJ failed to analyze the appropriate factors, see 20 C.F.R. § 404.1527(c), disregarded his testimony, failed to resolve inconsistencies between the medical opinions of the agency consultants and Dr. Floren, and "played doctor" impermissibly by relying on his own opinion.

The opinion of a treating doctor such as Dr. Floren usually is given controlling weight because a treating source is assumed to be familiar with a claimant's medical issues over time and can provide a unique perspective. See 20 C.F.R. § 404.1527(c)(2). Still, to be given controlling weight the opinion must be "well-supported" by objective medical evidence and not contradicted by substantial evidence in the record. See *id.*; *Ghiselli*, 837 F.3d at 776. An ALJ may not reject such an opinion without "good reasons." See 20 C.F.R. § 404.1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

Dr. Floren's work restrictions were conservative initially, but they progressively grew more restrictive. Yet Retzloff's MRIs, bone scans, and x-rays did not change significantly over time, and though the results of Floren's physical examinations varied, those results did not consistently worsen. All the while, Retzloff's subjective complaints grew worse—his reports changed from improvement or stability to new or worsening pain at each visit. He also reported diminished functional abilities. He did not frequently insist on obtaining benefits, but he did talk openly with Dr. Floren about his problems with worker's compensation, Social Security benefits, and finding work. It would not be unreasonable to infer that Dr. Floren ultimately decided to placate a demanding patient in rendering his medical opinions.

Relatedly, Retzloff contends that the ALJ did not explain his weighing of the other doctors' differing opinions. Again, this does not do justice to the ALJ's opinion. His discussion of the agency doctors' opinions is brief but to the point. He acknowledged their views of Retzloff's residual functional capacity but added more restrictions "to account for those postural restrictions opined by Dr. Floren." Saying more about the agency doctors' opinions would not illuminate the ALJ's decision, since for him the important conflict was not between the agency's consultants and Dr. Floren, but between Dr. Floren's early and later opinions.

We turn next to Retzloff's complaint about the ALJ's "boilerplate" representation that he considered the factors in § 404.1527(c). This was harmless, as the ALJ did discuss the relevant points, even if not by name. The ALJ evaluated the treatment relationship, in his discussion of Dr. Floren's medical opinions from February 2010 through May 2013, all of the treatment given to Retzloff, and the relevant physical exams and

tests, see 20 C.F.R. § 404.1527(c)(2)(i)–(ii). The ALJ's decision explains why Dr. Floren's later opinions cannot be reconciled with the record, covering both consistency and supportability. See *id.* § 404.1527(c)(3)–(4). The ALJ acknowledged Dr. Floren's specialty in occupational medicine, see *id.* § 404.1527(c)(5), and Retzloff does not identify any "other factor" that the ALJ neglected to consider, see *id.* § 404.1527(c)(6).

Retzloff also asserts that the ALJ never assessed whether Dr. Floren's later opinions were consistent with his testimony. But that is not accurate. The ALJ explained why he thought Retzloff was exaggerating: he relied on the tension between Retzloff's testimony about his daily activities and his earlier, more positive, reports to Dr. Floren. The ALJ also noted that Retzloff's account of "excruciating" pain was inconsistent with the medication he was taking. The ALJ was not required to provide any more detail.

Finally Retzloff argues that the ALJ "played doctor" in assessing his residual functional capacity. This assertion is meritless. An ALJ has "final responsibility" for determining a claimant's RFC and need not adopt any one doctor's opinion. See 20 C.F.R. § 404.1527(d)(2); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). More to the point, the ALJ relied not on his own assessment but on Dr. Floren's April 2010 opinion in concluding that Retzloff retained the ability to perform light work with occasional climbing, balancing, stooping, crouching, kneeling, and crawling. Retzloff obviously disagrees with the ALJ's choice of which of Dr. Floren's opinions to rely upon, but it is not for us to tell the ALJ which of two inconsistent opinions he should credit.

We are satisfied that the ALJ's analysis is supported by substantial evidence. The record supports the finding that Retzloff's workplace accident led to his discovery of apparently preexisting conditions that had not caused any pain previously. Physical examinations during the next four years found mostly "mild" to "moderate" issues, and diagnostic tests during that period showed no significant changes. Although Retzloff was complaining of worsening pain over time, he relied mostly on nonprescription pain relievers or nothing at all. And though Dr. Floren eventually opined that Retzloff no longer could work, the doctor never explained why his outlook dimmed. See *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010) (noting that medical experts must identify objective medical evidence in explaining "worsening prognosis"). The ALJ gave a rational explanation for why he concluded that Dr. Floren's opinion from April 2010 best reflects Retzloff's residual functional capacity.

We therefore AFFIRM the judgment of the district court.