In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-1691

SHANNON E. MCHENRY,

*Plaintiff-Appellant,*

*v.*

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:16-cv-03425-MPB-WTL — **Matthew P. Brookman**, *Magistrate Judge.*

ARGUED NOVEMBER 15, 2018 — DECIDED DECEMBER 26, 2018

Before BAUER, KANNE, and ST. EVE, *Circuit Judges.*

PER CURIAM. Shannon E. McHenry, a 49-year-old former hair stylist who suffers from a host of medical problems (both physical and mental), challenged the denial of her application for Social Security disability benefits. An Administrative Law Judge (ALJ) denied her application for disability insurance benefits after finding that, although she suffers from degenerative disc disease and fibromyalgia, she lacked sufficient

medical evidence that the conditions were disabling, and that she was not credible about her limitations. The district court upheld the ALJ's decision. McHenry now appeals, contending that the ALJ erred by failing to have a medical expert review a consequential MRI report, by not accounting for McHenry's mental or social limitations in her Residual Functional Capacity (RFC), and by discounting McHenry's credibility. Because we agree with McHenry that the ALJ should have acquired a medical expert to review a consequential MRI report, we vacate the judgment and remand for further proceedings.

## I. BACKGROUND

McHenry, then 45 years old, applied for Title II disability insurance benefits in 2013, alleging impairments that included degenerative disc disease, fibromyalgia, and depression. Her back pain started in 1990 after a car accident, and in 2005, an MRI of her lumbar spine showed "[m]ild disc space narrowing at L1-2 and mild spondylitic spurring at L3-4." McHenry began regular treatment for back pain and sciatica. Despite her pain, she worked as a hair stylist until at least 2009.

When she initially applied for disability benefits on December 8, 2013, McHenry alleged an onset date of January 1, 2009. After this application was denied, McHenry's oral request for an amended onset date of January 1, 2011—the date she alleged in her Title II disability application on December 11, 2013—was accepted by the ALJ at an administrative hearing on March 17, 2015. She was last insured to qualify for benefits on December 31, 2013. Because McHenry was required to establish that she became disabled before the date last

insured to qualify for benefits, *see Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012), the relevant time period is from January 2011 to December 2013.

In June 2011, McHenry began seeing a nurse practitioner, Jennifer Huisman. McHenry complained of back pain, stress, lack of sleep, and depression, and reported a history of fibromyalgia and chronic pain. She also told Huisman that she was working full-time and caring for her elderly mother. At this examination, Huisman observed that McHenry was diffusely tender at 16 of 18 trigger points, but that she did not appear to be in acute distress. She had a steady gait, no limitations in movement, full muscle strength, and normal reflexes.

Over the next two years, McHenry was examined eighteen times by Huisman and another nurse practitioner. During these exams, McHenry exhibited a steady gait, normal reflexes, normal muscle strength, and negative straight-leg raising tests. In August 2013, close to McHenry's date last insured, she was "[t]alkative" and "[i]n good spirits." She walked steadily and had equal and symmetrical deep tendon reflexes. At a few exams, however, McHenry had numerous positive trigger points. And after McHenry traveled to Alaska for a month-long trip in November 2013, she experienced debilitating back pain that required her to lie in bed for a week. At her next medical exam, she reported that she felt she could no longer "keep a job." Her nurse practitioner at the exam noted that McHenry had difficulty getting down from the examination table.

During the relevant period, McHenry's medical providers regularly treated her with a half-dozen medications at once.

In July 2011, McHenry complained about the concentration-related side effects of these medications, which included feeling "loopy." Her medical provider noted in July 2011 that her methadone needed to be titrated to reduce sedation side effects (*i.e.*, drowsiness). But physical examinations during the relevant period do not indicate that McHenry otherwise displayed significant side effects beyond not being able to drive or operate machinery. In June 2011, while on these medications, she told Huisman that she worked "full-time." One month later, she reported to Huisman that Prozac managed her depression symptoms. Huisman recorded in September 2011 that McHenry had "no problems w[ith] her meds." At this appointment, McHenry specifically denied "nausea, vomiting, or diarrhea." In November 2013, a month before the end of the relevant period, McHenry told nurse practitioner Vicky Owens that she "has always worked." Owens recorded that McHenry was "[t]aking her medications without any adverse effects."

Dr. Bruce Ippel, a physician, began treating McHenry two months after the relevant period. From April 2014 to mid-June 2014, he observed that McHenry suffered from a limited range of motion and muscle weakness. She also tested positive (for pain related to disc disease) in a bilateral straight-leg raising test. An April 2014 MRI showed that McHenry had multiple impinged nerve roots in addition to spinal cord compression. On a form signed on December 5, 2014, Dr. Ippel wrote that McHenry's degenerative disc disease of the lumbar spine met the severity required in 20 CFR § 404.1520(d), Pt. 404, Subpt. P, App. 1, Listing 1.04A ["Listing 1.04A"]. He observed that McHenry had sensory loss (numbness and tingling). In February 2015, two years after the relevant time

period, Dr. Ippel reported that her medications' side effects gave McHenry communication difficulties; cognitive problems; impaired judgment, decision-making, and memory; as well as confusion and drowsiness. Dr. Ippel opined that McHenry's debilitating condition dated back to June 2011.

After the Social Security Administration twice denied benefits, McHenry requested an administrative hearing. There, before an ALJ, McHenry testified that she could no longer work because of her back pain, cubital tunnel syndrome, sciatica, pinched nerve, spinal stenosis, and fibromyalgia. She described numbness in her fingers due to the pinched nerve in her shoulder blade, difficulties raising her left arm above her head, and numbness and tingling in her right leg. She said that she had moved in with her mother, who had to do "pretty much everything" for her, including her laundry. She could feed her cat, dust, and take a shower on her own, but she needed help washing her hair. She also needed help entering and exiting the tub to bathe. She said that she did not drive "at all" and had not since 2010. She also said that her medication (at that time, methadone three times per day, in addition to Norco, another opioid) made her "kind of loopy," as well as "sleepy" and "confused, dizzy."

The ALJ asked a vocational expert to consider the work that would be available to a person of McHenry's age and experience who could do a full range of light work, with the following limits: occasional lifting and reaching overhead; frequent use of the upper extremities for handling, fingering, grasping, and feeling type of activities; occasional climbing of ramps and stairs, balancing, kneeling, and stooping; never crawling, crouching, or climbing ladders, ropes, or scaffolds;

and alternating positions between sitting, standing, and walking once every forty-five minutes, while being able to maintain the alternate position for up to five minutes before resuming the previously held position. The VE testified that these limitations would prevent such a person from working as a hair stylist but allow her to work as a ticket seller and parking lot cashier.

Applying the administration's five-step analysis, 20 C.F.R. § 404.1520(a)(4), the ALJ first determined that McHenry met the insured status requirements and had not engaged in substantial gainful activity since her alleged onset date, January 1, 2011 (Step 1). The ALJ then found that although McHenry's degenerative disc disease and fibromyalgia were severe (Step 2), they did not meet or equal a listed impairment (Step 3), and her mental impairments caused no restrictions on her ability to work (Step 4). At Step 4, the ALJ assigned a residual functional capacity consistent with the hypothetical claimant he had described to the VE.

In assessing the severity and intensity of McHenry's symptoms, the ALJ found that her testimony overstated her limitations and was not supported by the medical evidence. The ALJ assumed McHenry was untruthful because in March 2012, she had reported to her nurse practitioner that she "rear-ended another car," despite having testified at her hearing that she had not driven a vehicle since 2010. The ALJ also discredited McHenry's description of the severity and intensity of her impairments by invoking McHenry's reports to her providers that she engaged in various exercises that he determined were inconsistent with her claims of disability, such as: yoga; riding her bike; gardening; and traveling to Alaska for

about a month, twice. The ALJ also gave no weight to the April 2014 MRI showing severe nerve root compression or to Dr. Ippel's opinions because the ALJ found that they were not consistent with the medical records during the relevant period.

Finally, the ALJ concluded that McHenry could perform jobs that existed in the national economy, so she was not disabled. The Appeals Council denied review, and the magistrate judge upheld the ALJ's denial of benefits. McHenry appealed.

## II. DISCUSSION

Because the Appeals Council declined McHenry's request for review, the ALJ's ruling represents the Social Security Commissioner's final decision. 20 C.F.R. § 404.981; *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). We directly review the ALJ's decision, *id.*, and we review with deference, refraining from substituting our judgment for that of the ALJ's, *Shideler v. Astrue*, 668 F.3d 306, 310 (7th Cir. 2012), and limiting our analysis of error to the grounds addressed by the ALJ, *see SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). We reverse the ALJ's determination only if it is not supported by substantial evidence. *Minnick*, 775 F.3d at 935.

### A. The ALJ's Listing 1.04A Analysis

McHenry first argues that the ALJ erred at Step 3 when he failed to subject a recent MRI to medical scrutiny. McHenry's April 2014 MRI demonstrated that McHenry had multiple impinged nerves in addition to spinal cord compression, which, McHenry contends, shows she met Listing 1.04A. Because the

2014 MRI raised a question of when her arguably disabling condition began, McHenry contends that only a medical expert could have drawn inferences from this medical evidence. But here, McHenry argues, the ALJ independently and impermissibly compared the MRI results with earlier medical records to determine, as the ALJ put it, whether the impairments "actually existed at the same or similar level" during the relevant time period.

We agree with McHenry that the ALJ impermissibly assessed the MRI report on his own without the assistance of a medical expert. We have said repeatedly that an ALJ may not "play[] doctor" and interpret "new and potentially decisive medical evidence" without medical scrutiny. *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ruling that the ALJ erred in failing to submit claimant's first MRI in 11 years to medical scrutiny and in interpreting results herself). An ALJ may not conclude, without medical input, that a claimant's most recent MRI results are "consistent" with the ALJ's conclusions about her impairments. *Akin v. Berryhill,* 887 F.3d 314, 317–18 (7th Cir. 2018).

In this case, the ALJ alone compared the test results with earlier treatment records to determine if McHenry's back impairment in April 2014 existed at the same level of severity during the relevant period. As in *Akin*, where we reasoned that the ALJ was not qualified to determine on his own whether the MRI results would corroborate the claimant's complaints "without the benefit of an expert opinion," 887 F.3d at 318, here, the ALJ was not qualified to assess on his own how the April 2014 MRI results related to other evidence in the record.

McHenry also argues that the ALJ erred in rejecting the only medical opinion regarding whether McHenry's condition met Listing 1.04A. Her treating physician, Dr. Ippel, opined that McHenry did meet Listing 1.04A during the relevant time period. We have previously held that a medical advisor's retrospective diagnosis may be considered only if "corroborated by evidence contemporaneous with the period of eligibility." *Liskowitz v. Astrue*, 559 F.3d 736 (7th Cir. 2009); *Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008). Here, treatment notes from McHenry's November 2013 exam indicate some measure of debilitating back pain and so supply evidence to corroborate Dr. Ippel's retrospective diagnosis. And while we cannot, any more than the ALJ can, draw a medical inference without objective evidence, we note that McHenry raises a plausible argument that it is unlikely that the level of nerve-root and spinal-cord compression present in her April 2014 MRI developed in the three months after the relevant time period ended.

To be sure, McHenry bore the burden to show that her back pain met or medically equaled *all* the criteria under Listing 1.04A between January 1, 2011 and December 31, 2013. 20 CFR §§ 404.1520, 404.1526(a); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). "An impairment that manifests only some of [the required criteria], no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). As the ALJ detailed, over the course of eighteen physical examinations during the relevant time period, McHenry was not diagnosed with the "neuro-anatomic distribution of pain," limited spinal motion, motor loss with sensory or reflex loss, or positive straight-leg raising tests—all requirements to meet Listing 1.04A. But, while her final two physical exams in late 2013

showed no physical signs of nerve impingement, treatment notes from her November 2013 exam show that McHenry reported experiencing back pain so debilitating that she needed to lie in bed for a week. During this exam, McHenry also shared that she felt she could no longer "keep a job."

Thus, the ALJ's determination that McHenry's condition did not meet Listing 1.04A's requirement was not supported by substantial evidence because he failed to obtain a medical expert to review the April 2014 MRI and he rejected the only medical opinion regarding whether McHenry's condition met Listing 1.04A.

The ALJ's errors at Step 3 warrant remand. For the sake of completeness, we address McHenry's remaining arguments, which we do not find persuasive in light of the deferential standard.

### B. The ALJ's Residual Functional Capacity Assessment

McHenry contends that the ALJ improperly determined McHenry's RFC by first, not accounting for McHenry's anxiety-related limits on social functioning and limits in her ability to sustain concentration because of her medications' side effects; and second, by discounting McHenry's credibility.

### 1. McHenry's Mental or Social Limitations

McHenry contends that the ALJ erred by omitting from McHenry's RFC anxiety-related limits on social functioning, as well as limits in McHenry's ability to sustain concentration because of her medications' side effects. Because she complained about concentration-related side effects of her medications, she asserts that the ALJ wrongly concluded that

treatment notes during the relevant period failed to disclose any adverse side effects, especially for a continuous period of at least twelve months.

McHenry did occasionally describe side effects. One treatment note states that her methadone needed to be titrated to reduce sedation side effects, and she was advised not to drive or operate machinery. Yet she also told her medical providers that she had "no problems w[ith] her meds," and that she was "[t]aking her medications without any adverse effects." McHenry specifically denied "nausea, vomiting, or diarrhea," and she reported that Prozac managed her depression symptoms. Moreover, McHenry's own accounts show that she worked while she took her prescription medications. True, Dr. Ippel opined that McHenry had communication difficulties; cognitive problems; impaired judgment, decision-making, and memory; and confusion and drowsiness, but he said so in February 2015, over one year after the date last insured. Further, the mere listing of side effects is insufficient to establish functional limitations, and no evidence shows how McHenry's medications affected her ability to work. *See Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). There is even less evidence with respect to any limiting effects on her social functioning caused by anxiety. And McHenry does not suggest any. Therefore, the ALJ did not erroneously fail to limit social interactions as part of McHenry's RFC.

### 2. McHenry's Credibility

McHenry also takes issue with the ALJ's credibility determination, a conclusion we will disturb only if it is "patently wrong." *See Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008).

She first contends that the ALJ erred in finding that she was dishonest about driving without probing further at the administrative hearing. The ALJ deemed McHenry untruthful because she testified that she had not driven since 2010 yet had reported to her nurse practitioner that she "rear-ended another car" in March 2012. According to McHenry, the ALJ needed to ask her about this discrepancy before making an adverse credibility finding. McHenry is wrong. True, an ALJ may not draw negative inferences from a claimant's failure to seek treatment without first considering the individual's explanation. S.S.R. 96-7p, 1996 WL 374186, at *7, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements; *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014). But whether McHenry testified credibly about driving is not a matter of her medical treatment history, so the ALJ did not need to inquire.

Neither did the ALJ err when he discredited McHenry's descriptions of the severity and intensity of her impairments during the relevant period by invoking her physical activities, including yoga, biking, gardening, and extensive travel. McHenry does not minimize the exertional level or the extent of her activities. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (requiring an ALJ to distinguish "between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day"); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (explaining that minimal activities do not show that a claimant can engage in "substantial physical activity"). Instead, she again argues that the ALJ could not use her physical activity against her without probing the extent of it with questions at the hearing. But an ALJ has the burden of inquiry only when drawing inferences

about the severity of a condition from the failure to seek or continue medical care, S.S.R. 96-7p, 1996 WL 374186, at *7, because lack of money or insurance might explain possible discrepancy. *See Beardsley*, 758 F.3d at 840. In this case, McHenry neither failed to seek nor failed to continue medical care.

Finally, as the Commissioner highlights, McHenry barely discusses one basis of the adverse credibility finding. In her disability application, she stated that she stopped working on January 1, 2009—which was the onset date she first listed before amending it to January 1, 2011—due to her impairments, and at her hearing she testified that she had not worked since January 1, 2011. But she told her medical providers during the relevant period, which began on January 1, 2011, that she still worked as a hair stylist. Not only does this undermine her credibility generally, it also contradicts her account of the physical limitations caused by her back impairment. McHenry now surmises that her providers must have misunderstood her statements that she *tried* to work and to cut her family's hair. But McHenry's speculation (and her disparagement of the ALJ), do not amount to a showing that the ALJ was "patently wrong." *See Curvin*, 778 F.3d at 651.

### III. CONCLUSION

Our task is to determine whether substantial evidence supports the ALJ's conclusion; here, it does not. Thus, we VACATE the judgment of the district court upholding the ALJ's decision to deny McHenry benefits and REMAND for further proceedings consistent with this opinion.