**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 18, 2019
Decided January 23, 2020

**Before**

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-1885

| | |
|---|---|
| MICHAEL ANTHONY GIBBONS, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Central District of Illinois. |
| *v.* | No. 17-2224 |
| ANDREW M. SAUL, Commissioner of Social Security, *Defendant-Appellee*. | Eric I. Long, *Magistrate Judge*. |

**O R D E R**

In 2011, a sheet of ice struck Michael Gibbons in the head and exacerbated a preexisting neck injury. By 2013, the pain in his neck, shoulders, and arms had worsened to the point he could no longer work. He applied for disability benefits. An administrative law judge determined Gibbons had several severe impairments related to neck and shoulder pain but nonetheless denied benefits, concluding Gibbons could still perform light work with limitations.

The ALJ's findings were based on the opinion of an agency physician who reviewed Gibbons's application for benefits but did not examine him. Because that opinion had several flaws the ALJ did not address, and because the ALJ did not support

her decision with other medical evidence, the ALJ's decision was not based on substantial evidence. The ALJ further erred by relying on her own lay interpretation of medical findings to discount a treating surgeon's opinion Gibbons could never reach overhead. We therefore vacate the ALJ's decision and remand to the agency for further proceedings.

## I.     Background

Gibbons has spent almost a decade in severe pain. During that time, at least eight medical professionals opined on how the pain affected him. This appeal concerns four of them: (1) Dr. Daniel Riew, the orthopedic surgeon who performed Gibbons's most recent surgery; (2) Dr. Harel Deutsch, a physician who examined Gibbons on behalf of a worker's compensation provider; (3) Dr. Arash Farahvar, a neurosurgeon who examined Gibbons but did not operate on him; and (4) Dr. Richard Bilinsky, an agency consulting physician who reviewed Gibbons's application for benefits but did not examine him.

### A.    Medical history

In 2003, Gibbons, then 40 years old, slipped and fell on his back. The accident caused extreme pain in his neck and arms, and he ultimately needed two surgeries to fuse three vertebrae in his neck. After the surgeries, Gibbons recovered and worked as a facility manager for a local church, performing building maintenance and other work that required heavy exertion.

In February 2011, a piece of ice fell off a building and struck Gibbons in the head while he was at work. He suffered a concussion and experienced renewed pain in his neck, shoulders, and arms. A CT scan showed his vertebrae were still fused but he had suffered degeneration elsewhere in his spine.

Over the next five years, Gibbons experienced increasing pain. His doctors cycled him through an array of different painkillers, including narcotics like Norco (hydrocodone and acetaminophen), Opana (oxymorphone), Oxycontin (oxycodone), methadone, Avinza (morphine tablets), Percocet (oxycodone and acetaminophen), and fentanyl.

Shortly after the concussion, Gibbons's doctor allowed him to return to work, but with orders to lift no more than 15 pounds and to avoid overhead work. Gibbons continued to work full time until September 2011, when his pain increased to the extent he could work only four hours a day, even with the limitations recommended by his

doctor. In December 2011, an electromyogram showed a possible injury in Gibbons's right long thoracic nerve (a nerve that runs from the spine through the shoulder and upper chest). Although Gibbons complained the pain was more serious in his left arm, no similar injury was discovered in his left shoulder, suggesting the pain on his left side originated in his spine.

Gibbons worked part time until February 2013. A CT scan taken then showed mild to severe foraminal stenosis (a narrowing of the passageway through which the spinal nerve root runs) and facet arthrosis (arthritis of the joints between vertebrae) at several points in his upper vertebrae. Although Gibbons demonstrated normal strength and range of motion in his upper extremities, he complained of worsening headaches and shoulder pain radiating from his neck. He stopped working and successfully filed for worker's compensation.

In May 2013, Gibbons saw orthopedic surgeon Dr. Riew for the first time, reporting pain in his neck, arms, and shoulders, especially on his left side. Dr. Riew observed Gibbons had normal reflexes and motor strength but noted Gibbons's left-hand grip was weaker than his right, even though he was left-handed. After viewing Gibbons's previous CT scan and an earlier MRI, Dr. Riew diagnosed Gibbons with a possible pinched nerve. That August, he operated on Gibbons and fused two more vertebrae in his neck. Two months later, Dr. Riew again examined Gibbons and opined he could return to work in two weeks, and lift up to 30 pounds, but should not perform overhead activity.

In November, Gibbons returned to Dr. Riew with complaints of serious left shoulder pain. Gibbons had normal strength in both arms during the examination, but he had a positive Spurling's sign (a physical test used to assess the presence of nerve-root pain). Dr. Riew recommended Gibbons refrain from work for one week and not lift more than 40 pounds for the next three months. A follow-up exam in January 2014 revealed global weakness and atrophy in Gibbons's left arm, and his left upper arm and forearm were 1.5 centimeters smaller than on his right. But Dr. Riew nonetheless opined Gibbons could return to work with the same restrictions against lifting more than 40 pounds or reaching overhead.

In April 2014, however, Dr. Riew examined Gibbons again and changed his prognosis. After viewing an updated CT scan, he diagnosed Gibbons with a chronic pinched nerve caused by a surgical screw impinging the joint between two vertebrae at the base of the neck. That scan also revealed severe left foraminal stenosis near the vertebrae where Dr. Riew had performed surgery. Dr. Riew filled out a worker's

compensation form stating Gibbons should remain off work for the next three to six months, and he ordered Gibbons to return for a follow-up appointment in four months. For unexplained reasons, Gibbons did not see Dr. Riew again.

That June, Dr. Deutsch examined Gibbons on behalf of Gibbons's employer's worker's compensation provider. Dr. Deutsch said he concurred with Dr. Riew's earlier opinions that Gibbons could lift up to 40 pounds, but he did not mention Dr. Riew's most recent opinion that Gibbons should remain off work. He also said he disagreed with the December 2011 electromyogram showing a long thoracic nerve injury on the right side because later electromyograms did not replicate those results.

In October, the neurosurgeon Dr. Farahvar examined Gibbons. He disagreed with Dr. Riew's diagnosis regarding the cause of Gibbons's pain. Rather than an impinging screw at the base of the neck, he thought a pinched nerve near the top of the neck was the primary source of Gibbons's pain. But he recommended delaying surgery until he could verify his diagnosis and determine whether conservative treatment would be effective. In the meantime, he ordered several tests and a neck brace for Gibbons to wear in the car. Dr. Farahvar then filled out a medical-source statement for Gibbons's disability application, opining Gibbons could never lift any weight (even under 10 pounds) and never reach overhead, handle, push, or pull with either arm. He also stated Gibbons could not sit, stand, or walk for more than one hour per day, and that Gibbons needed to spend the majority of the day resting in bed. A year and a half later, in February 2016, Dr. Farahvar filled out a second questionnaire without examining Gibbons again, now opining Gibbons *could* occasionally lift objects less than 10 pounds, but could not sit or stand for more than 20 minutes at a time, and could not walk at all. He also opined Gibbons should avoid exposure to odors, fumes, and pulmonary irritants, even though he cited no diagnosis that would require such a restriction and was not himself a pulmonologist.

## B.   Procedural history

Gibbons applied for disability insurance benefits, alleging he became disabled in January 2013, around the time he stopped working. His claim was denied initially and on reconsideration.

At the reconsideration level, the determination included a medical opinion from Dr. Bilinsky, an agency consultant who reviewed the record but did not examine Gibbons. Unlike Drs. Riew's and Farahvar's opinions, which had concluded Gibbons could not perform any work, Dr. Bilinsky found Gibbons could perform actions

consistent with light work. He opined Gibbons could occasionally lift 20 pounds and frequently 10 pounds, occasionally reach overhead with his right arm, and occasionally handle with his left hand.

At a hearing before an ALJ, Gibbons described how the pain radiating from his neck affected his daily life. He testified he could lift a gallon of milk with his right hand, but not with his dominant left hand, and he had difficulty reaching for things in overhead cabinets, especially with his left arm. He stated he avoided driving because of his prescriptions for fentanyl, Percocet, and valium. He said his wife and daughter do all the household chores, and he shaves only once a week because of the pain in his arms and shoulders. Finally, he testified Dr. Farahvar does not want to perform surgery because his pinched nerve is located near his brain stem and scar tissue from his previous surgeries makes it too risky.

The ALJ found Gibbons was not disabled. She determined Gibbons's left carpal tunnel, cervical radiculopathy (pinched nerve), degenerative disc disease, and right shoulder disorder were severe impairments. But based on Dr. Bilinsky's opinion—the only opinion the ALJ assigned "great weight"—the ALJ concluded Gibbons could still perform light work so long as, among other restrictions, he was limited to only frequent handling with the left hand; occasional reaching overhead with the right arm; occasional head turning; and no driving. A vocational expert testified a person with these limitations would be able to find work as a small-products assembler or a retail marker.

In reaching these conclusions, the ALJ discounted Dr. Farahvar's opinions, which she reasoned were inconsistent, contradicted by the record, and included opinions outside Dr. Farahvar's expertise. She also discounted Dr. Riew's opinion that Gibbons could never reach overhead because she said there was not sufficient evidence of a thoracic nerve injury. But she assigned "some weight" to Dr. Riew's earlier opinions that Gibbons could lift up to 40 pounds (as well as Dr. Deutsch's concurrence with it), stating the suggested limitations "appear reasonable within the period of necessary healing for the claimant's neck surgery." Considering Gibbons's more recent complaints of pain, however, the ALJ concluded more significant restrictions were necessary and adopted those suggested by Dr. Bilinsky.

Gibbons appealed the ALJ's decision, and the Appeals Council determined the ALJ erred by giving great weight to Dr. Bilinsky's opinion without adopting his recommendation that Gibbons be limited to only occasional handling with his left hand. The Appeals Council altered the ALJ's findings to include this limitation, as well as an

additional limitation—unexplained—of no overhead reaching with the nondominant right hand. Otherwise the Appeals Council adopted the ALJ's findings. Because the vocational expert had testified someone with those two additional limitations could still find work as an usher, photo counter clerk, or furniture rental clerk, the Appeals Council upheld the ALJ's determination that Gibbons was not disabled.

The district court affirmed the Appeals Council's decision.

## II.    Analysis

### A.   Standard of review

We will uphold the agency's final decision if supported by "substantial evidence," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Our role is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [our] judgment for that of the Commissioner." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal citations and alterations omitted). The agency's decision, however, must build a "logical bridge" from the evidence to its conclusions. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

### B.   Discussion

Gibbons contends the ALJ erred by adopting Dr. Bilinsky's opinion instead of Dr. Farahvar's opinions, and by failing to give weight to Dr. Riew's opinion that Gibbons could not reach overhead. The Commissioner responds the ALJ was faced with a sea of medical opinions and took a reasonable course in weighing them.

The Commissioner is only partially correct. It is true the ALJ did not err in assigning little weight to Dr. Farahvar's opinions. An ALJ may assign limited weight to a treating physician's opinions if the ALJ articulates "good reasons" for doing so. 20 C.F.R. § 404.1527(c)(2); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). And here, the ALJ articulated several reasons for discounting Dr. Farahvar's opinions. For example, the ALJ noted Dr. Farahvar's extreme limitations for Gibbons (including the inability to walk even short distances) were contradicted by evidence of Gibbons's consistently normal gait and ability to walk without a cane or other assistive device. And as the ALJ explained, Dr. Farahvar opined on subjects outside his expertise and gave inconsistent opinions on whether Gibbons could lift up to 10 pounds. These were all valid reasons to assign little weight to Dr. Farahvar's opinions; an ALJ is not required to accept opinions contradicted by other medical evidence. *Burmester*, 920 F.3d

at 512, and may discount opinions that are inconsistent or fall outside the doctor's expertise, *Alvarado v. Colvin*, 836 F.3d 744, 748 (7th Cir. 2016).

After discounting Dr. Farahvar's opinions, however, the ALJ needed to point to other evidence supporting her decision. *See Stephens*, 888 F.3d at 327 (ALJ must build "logical bridge" from evidence to conclusion). Rather than adopt the opinions of one of the many other medical professionals who treated Gibbons, the ALJ turned to Dr. Bilinsky. But Dr. Bilinsky did not examine Gibbons, and there are several aspects of his opinion that suggest he did not undertake a careful review of the medical records. For example, Dr. Bilinsky repeatedly referred to Gibbons as "she," even though Gibbons is male. And Dr. Bilinsky incorporated into his opinion a disability examiner's conclusion that Gibbons was not entitled to benefits—suggesting Dr. Bilinsky already had this conclusion in mind when he wrote the opinion.

More critically, Dr. Bilinsky misread Dr. Riew's April 2014 examination by stating the exam revealed "no atrophy." Dr. Riew found only that there was no atrophy in Gibbons's hands; he stated there *was* atrophy in Gibbons's left upper arm and forearm (his dominant arm), which were measured 1.5 cm smaller than his right arm. Dr. Bilinsky then compounded this error by stating Gibbons's grip was decreased in his nondominant hand, rather than his dominant left hand, as indicated by the examination. These errors were significant because the April 2014 examination marked a turning point in Gibbons's treatment. It was the examination at which, after repeatedly opining that Gibbons was on the cusp of returning to work with only minor limitations, Dr. Riew ultimately decided Gibbons could not work for at least another three to six months. And Dr. Bilinsky's misunderstanding of Dr. Riew's notes relates directly to his assessment of Gibbons's ability to lift, carry, and reach with his dominant left arm. An ALJ must consider whether a medical opinion is consistent with the record before assigning it weight. 20 C.F.R. § 404.1527(c)(4). Yet the ALJ did not address these inconsistencies; she merely stated the opinion was "consistent with the record as a whole" and more restrictive than Dr. Riew's older, 40-pound lifting restriction.

The Commissioner maintains the ALJ also relied on the opinions of Dr. Riew and Dr. Deutsch in addition to Dr. Bilinsky. But although both those doctors opined at different times Gibbons could lift up to 40 pounds, the ALJ assigned their opinions only "some weight" and reasoned Gibbons's testimony warranted stricter lifting restrictions. Ultimately, she seems to have adopted the opinions only to the extent they agreed with Dr. Bilinsky. But even if the ALJ had meant to adopt Dr. Riew's recommendations in part, she conflated Dr. Riew's final two examinations, stating Dr. Riew had opined in "early 2014" that Gibbons could "lift up to 40 pounds and return to work in three to six

months." These opinions were actually months apart: In January, Dr. Riew opined Gibbons could work with modest limitations but changed his prognosis in April and ordered Gibbons to refrain from work pending reexamination in four months. So the ALJ failed to appreciate the progression of Gibbons's condition. *See Lambert v. Berryhill*, 896 F.3d 768, 775 (7th Cir. 2018) (explaining that physicians may update their views based on a patient's changed condition).

The ALJ also impermissibly "played doctor" when she rejected Dr. Riew's proposed restrictions on overhead reaching with either arm. Although the Appeals Council later found Gibbons could never reach overhead with his right arm, neither the ALJ nor the Appeals Council placed a similar restriction on his left arm (which Gibbons alleged was more limited). The ALJ explained the restriction was unwarranted because "only [the December 2011 electromyogram] demonstrated any abnormal findings, and others revealed no evidence of a long thoracic nerve injury." But Dr. Riew did not cite a thoracic nerve injury as the reason for his overhead-reaching restriction. And the doctor who examined Gibbons after his head injury in February 2011 gave similar precautions, almost a year before the electromyogram in question. Without relying on any medical evidence, the ALJ assumed a thoracic nerve injury was required for an overhead-reaching restriction, contrary to the well-established rule that ALJs should not attempt to analyze the significance of medical findings without input from an expert. *See McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

We are not persuaded by the Commissioner's response that, rather than playing doctor, the ALJ was echoing the report of Dr. Deutsch. Although the Commissioner is correct that Dr. Deutsch disagreed with the diagnosis of a thoracic nerve injury on Gibbons's right side, nothing in Dr. Deutsch's report said he disagreed with Dr. Riew's opinions on overhead reaching. And ultimately, whether Gibbons had a nerve injury on his right side is irrelevant because the Appeals Council already placed a reaching restriction on Gibbons's right arm. Only Gibbons's left arm is at issue, and doctors consistently found the limitations in Gibbons's left arm were caused by pain radiating from his spine. No doctor suggested Gibbons also had a nerve injury on his left side; the ALJ simply conflated two separate impairments. *See Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016) ("[T]he ALJ improperly played doctor when he ignored expert opinions to arrive at his own, incorrect, interpretation of the medical evidence.").

### III.    Conclusion

Because the ALJ's decision was not based on substantial evidence, we vacate the judgment and remand to the agency for further proceedings.