In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 21-3235

IRIS J. DURHAM,

*Plaintiff-Appellant,*

*v.*

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:20-cv-00623 — **J. Phil Gilbert**, *Judge.*

---

ARGUED SEPTEMBER 15, 2022 — DECIDED NOVEMBER 21, 2022

---

Before SYKES, *Chief Judge*, RIPPLE and KIRSCH, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Iris J. Durham filed for disability benefits on September 12, 2017. An Administrative Law Judge ("ALJ") considered her claim and concluded that Ms. Durham's diabetes, hypertension, and tachycardia were limiting, but not disabling, conditions. On review, the district court concluded that substantial evidence supported the ALJ's determination.

Seeking further review in this court, Ms. Durham now contends that the ALJ relied on outdated evidence and over-stepped his authority by interpreting, without supporting medical opinions, the results of medical tests. We cannot accept Ms. Durham's submission. The record reveals that the ALJ carefully considered Ms. Durham's entire medical history and relied on the opinions of her treating physicians in reaching his conclusions about her physical limitations. We therefore affirm the judgment of the district court.

## I.

## BACKGROUND

### A.

At the time Ms. Durham applied for benefits, she was forty-six years old and had been diagnosed with diabetes and hypertension. Her records reveal that she was seen by a physician's assistant, Sherry Locey, in February 2016, June 2016, and January 2017 for these conditions, as well as neck pain.

On March 3, 2017, Ms. Durham returned to Ms. Locey, with a new complaint: heart palpitations. She had been experiencing symptoms, which included shortness of breath and lightheadedness, for about three weeks. Ms. Durham reported that she had experienced these symptoms in the past (about a year and a half before), but they seemed worse to her this time. Ms. Locey ordered tests, including Holter monitoring, and referred Ms. Durham to a cardiologist.

Later in March, Ms. Durham saw Dr. Mohamed Ibrahim for follow-up on her heart palpitations. The Holter monitoring ordered by Ms. Locey revealed premature ventricular contractions and tachycardia for thirty percent of monitored beats. Dr. Ibrahim ordered an electrocardiogram ("EKG"),

blood panel, and myocardial perfusion scan. He also counseled her to reduce her caffeine intake (she reported drinking five Mountain Dews per day) and, more generally, to adopt a healthy lifestyle.

On April 20, 2017, Ms. Durham returned to Dr. Ibrahim to review her test results. Her stress test with myocardial perfusion study was normal. Ms. Durham had reduced her caffeine intake significantly and was having only occasional palpitations. Dr. Ibrahim adjusted one medication. He also noted that her lipoprotein levels were not satisfactory and again encouraged her to work on a healthy lifestyle.

On September 21, 2017, Ms. Locey saw Ms. Durham for both diabetes and heart palpitations. During that visit, Ms. Durham complained of tingling in her feet. She also stated that her heart palpitations had worsened; she explained that she had not been taking her prescribed medication because she had lost her medical card and could not afford the prescription. Ms. Locey ordered bloodwork and sent a note to Dr. Ibrahim concerning Ms. Durham's inability to afford her medication.

The following week, Ms. Durham went to Good Samaritan Regional Health Center Emergency Room due to chest pain, accompanied by lightheadedness and shortness of breath. The chest pain was intermittent, correlated with walking, and had begun three to five hours prior. The hospital treated her with metoprolol, which eased her palpitations. She was discharged the same day with a prescription for metoprolol.

On October 5, 2017, Ms. Durham had a follow-up appointment with Dr. Ibrahim. She reported that she was doing well with the medication and had "[n]o recent palpitations, pre-

syncope or syncope."[1] The same day, Ms. Durham also saw Ms. Locey for ongoing treatment for her diabetes. She reported bilateral foot pain. She also stated that her palpitations were "better, but not completely gone."[2]

Almost nine months later, on July 31, 2018, Ms. Durham returned to Ms. Locey, complaining of an increase in headaches and some breakthrough tachycardia, especially when she worked out in the heat. She saw Ms. Locey again on August 29, 2018, and on February 12, 2019, for diabetes management. Ms. Durham was counselled to increase physical activity and decrease calorie intake.

Ms. Durham returned to Ms. Locey on March 26, 2019, due to shortness of breath, palpitations, and occasional faintness. After examining Ms. Durham, Ms. Locey ordered a chest x-ray, stress test, EKG, Holter monitoring, and blood work.

The following week, Ms. Durham was admitted to Good Samaritan Hospital due to "exertional shortness of breath and palpitations."[3] She was seen by interventional cardiologist, Dr. Labroo, as well as electrophysiologist, Dr. Binh Nguyen. An EKG and a stress test were performed. "Cardiology … suggest[ed] [an] outpatient sleep study" and "recommended medical management with continuation of her metoprolol with extra PRN beta blocker for palpitations."[4] As Ms. Durham's palpitations had resolved, she "was

---

[1] A.R. 288.

[2] *Id*. at 390.

[3] *Id*. at 579.

[4] *Id*. at 580.

discharged in stable condition" the following day and referred to Dr. Nguyen for follow-up.[5]

At her April 9, 2019 appointment, Dr. Nguyen discontinued Ms. Durham's beta blocker and prescribed Sotalol. Dr. Nguyen discussed ordering a cardiac catheterization for further evaluation of her symptoms. On April 22, 2019, a pre-procedure examination revealed that Ms. Durham had no cardiac instability, "no acute problems, [and] no functional limitations."[6] Ms. Durham underwent a cardiac catheterization, and the results were normal. Following the catheterization, Dr. Nguyen reported the results to Ms. Locey. Regarding the plan for Ms. Durham's care, Dr. Nguyen listed:

1. Refill aldactone

2. Continue with current medications

3. Return in 3 months[.][7]

No further procedures were recommended, and no restrictions were placed on Ms. Durham.

## B.

On September 12, 2017, Ms. Durham applied for disability benefits alleging an onset date of March 1, 2016. On her application for benefits, she listed the following conditions that limited her ability to work:

1. Diabetes

---

[5] *Id.*

[6] *Id.* at 660 (capitalization removed).

[7] *Id.* at 733.

2. Swollen feet and legs

3. High blood pressure

4. Pain in feet

5. High cholesterol[.][8]

An agency consulting physician noted Ms. Durham's records had been received from Ms. Locey and identified Ms. Durham's impairments as diabetes mellitus, essential hypertension, and obesity. The consulting physician provided the following explanation for the physical and postural limitations noted in her report:

> Clmt has dx in file of DM, HBP and obesity (BMI 42.2), Clmt had echo completed 4/17 showing 60% EF. Clmt has hx of tingling in her feet, reports of not always being complaint [sic] with medications. Most recent physical apt 10/17 reports clmt ambulated normally, had full rom in all joints/spine, no difficulties with any extremity, c/o joint pain and bilateral foot pain, diabetic foot exam revealed normal inspection, motor strength normal.[9]

Ms. Durham's claim was denied at the initial review level.

On reconsideration, a different agency consulting physician reviewed Ms. Durham's records, which included Dr. Ibrahim's treatment notes through June 2, 2018. Ms. Durham's

---

[8] *Id.* at 197.

[9] *Id.* at 75.

claim again was denied, and her case was referred to an ALJ for a hearing.

At the May 17, 2019 hearing, Ms. Durham testified that she had last worked in 2017 as a personal assistant for a home health care service. She testified that she could no longer do that job because of her "neuropathy."[10] She also testified that she was not pursuing other jobs because of her "spells," comprised of dizziness, lightheadedness, and shortness of breath.[11] She explained that standing exacerbated the neuropathy pain, but she still experienced pain even when sitting and lying down. She testified that she was relying more on her son to take care of the grocery shopping. Although she still fixed meals, she brought a chair into the kitchen so that she could sit down if she got tired. She also was attending fewer of her children's sporting events because she could not walk for any prolonged period.

In response to the ALJ's question as to whether she could perform sedentary work, she replied: "My thing with that is per doctor's orders, they told me to prop my feet up because of the swelling and because of my heart condition."[12] When the ALJ asked if that was documented, counsel for Ms. Durham responded: "I did not see it in the records, Judge."[13] According to Ms. Durham, these instructions were given to her by Dr. Labroo while she was in the hospital.

---

[10] *Id*. at 39.

[11] *Id*. at 40.

[12] *Id*. at 41.

[13] *Id.*

A vocational expert also testified at the hearing. The ALJ posed a hypothetical question to the expert regarding an individual who mirrored Ms. Durham in age, work history, and education. In the hypothetical, the claimant could perform only sedentary work, "[c]ould only occasionally climb ramps and stairs; never ladders, ropes, and scaffolds. She c[ould] occasionally stoop, kneel, crouch, and crawl. [She] must avoid unprotected elevations[,] … being near dangerous moving machinery[,] … [and] concentrated exposure to extreme heat or humidity."[14] The vocational expert testified that such an individual could perform the jobs of document preparer, receptionist/information clerk, telephone quotation clerk, and addresser.

On June 13, 2019, the ALJ issued an unfavorable decision, concluding the Ms. Durham's impairments permitted the performance of other work. The ALJ found that Ms. Durham had the following severe impairments: diabetes, hypertension, episodes of "nonsustained V-tach," and obesity.[15] The ALJ then noted each of Ms. Durham's encounters with her health care providers regarding her diabetes and heart issues. He concluded that, although Ms. Durham's medical records were consistent with her claims of pain, "when considered as a whole, [they] were not supportive of the contention that the existence of [her] impairment[s] would be preclusive of all types of work."[16] The ALJ specifically noted that, although Ms. Durham testified at the hearing that she needed to

---

[14] *Id.* at 56–57.

[15] *Id.* at 16.

[16] *Id.* at 21.

"elevate her legs," "[s]uch a limitation[] was not noted in her function reports," and "[t]here [wa]s no indication that any provider ha[d] recommended the claimant elevate her legs. In addition, her mild exam findings; her limited specialty care/follow-up; and her improvement with medication d[id] not support further limitations as those detailed in the highly restrictive residual functioning capacity."[17]

The ALJ also referenced the opinions of the agency's medical consultants and found that "[t]heir opinions [we]re consistent with the claimant's … mild exam findings; her limited specialty care/ follow-up; and her improvement with medications; and her activities of daily living."[18] Overall, the ALJ found the opinions "somewhat persuasive."[19]

The ALJ then concluded that Ms. Durham's statements regarding her "impairments and her resulting limitations [we]re not entirely consistent with the objective medical evidence."[20] "Taking into consideration the claimant's subjective complaints, as well as the objective medical evidence," the ALJ concluded that Ms. Durham was "capable of exertionally sedentary work."[21] However, her "ability to perform exertionally sedentary work [wa]s reduced somewhat by the additional limitations set forth in the residual functional

---

[17] *Id.* at 22.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

capacity."[22] Because the vocational expert had concluded that there were jobs in the national economy that were both sedentary and could accommodate the other restrictions in the hypothetical scenario, the ALJ concluded that Ms. Durham was not disabled.

After the Appeals Council denied review, Ms. Durham filed this action in district court on June 28, 2020, seeking judicial review of the Commissioner's unfavorable decision. On October 4, 2021, the district court entered a decision affirming the Commissioner's final determination.

## II.

We review de novo the district court's judgment affirming the Commissioner's decision, but we apply the deferential "substantial evidence" standard when reviewing the ALJ's decision. 42 U.S.C. § 405(g); *see also, e.g.*, *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). "[W]hatever the meaning of 'substantial' in other contexts," the Supreme Court has made clear that in the disability context, "the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

## A.

Ms. Durham's primary argument is that the ALJ relied on stale opinions of medical experts in rendering his decision. According to Ms. Durham, neither of the consulting agency

---

[22] *Id.*

physicians considered her cardiac arrhythmia and related symptoms. She also maintains that these experts' opinions cannot be relied upon given her hospitalization in April 2019 and the results of her follow-up tests. She asserts that the ALJ "should have re-submitted [her] case to medical expert scrutiny in light of th[is] potentially determinative and highly complex medical evidence."[23] Because no medical expert interpreted this evidence, Ms. Durham submits, the ALJ impermissibly "played doctor" in concluding that this evidence did not establish complete disability.

Had the ALJ, as Ms. Durham suggests, relied heavily on the opinions of the consulting physicians who failed to recognize Ms. Durham's tachycardia, that would raise concern. The ALJ, however, found the consulting physicians' assessments only "somewhat persuasive."[24] Instead, the ALJ primarily relied on Ms. Durham's treatment records. These records served as the basis for his conclusion that Ms. Durham's tachycardia was a severe impairment and for the restrictions that he incorporated into his hypothetical question to the vocational expert. Additionally, although neither agency consulting physician explicitly mentioned tachycardia, the last agency consulting physician evaluated Ms. Durham's records as of June 5, 2018. The records included Ms. Durham's treatment by Dr. Ibrahim through June 2, 2018, which revealed that Ms. Durham had been diagnosed with tachycardia in March 2017 and that her condition was largely controlled through medication.

---

[23] Appellant's Br. 12.

[24] A.R. 22.

Moreover, had the ALJ interpreted results of "highly complex" medical tests on his own, that would be problematic. For instance, we repeatedly have criticized ALJs for interpreting the results of an MRI and using that interpretation as a basis for denying benefits. In one such case, *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018), an MRI revealed that the claimant "had multiple impinged nerves in addition to spinal cord compression." However, without the input of a medical expert, "the ALJ independently … compared the MRI results with earlier medical records" to determine the existence and level of the claimant's impairments. *Id.* We held that the ALJ had overstepped his role, noting that we had stated "that an ALJ may not 'play[] doctor' and interpret 'new and potentially decisive medical evidence' without medical scrutiny." *Id.* (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)); *see also Akin v. Berryhill*, 887 F.3d 314, 317–18 (7th Cir. 2018) (stating that "without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment"). We reiterated that "[a]n ALJ may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions about her impairments." *McHenry*, 911 F.3d at 871 (quoting *Akin*, 887 F.3d at 317–18). Because in *McHenry* "the ALJ alone [had] compared the test results with earlier treatment records" to determine the severity of the impairment during the relevant time period, we concluded that the ALJ's decision was not supported by substantial evidence. *Id.* at 871–72.

This line of cases, however, is not relevant to Ms. Durham's situation. Some of Ms. Durham's tests certainly were complex. But the ALJ did not attempt to interpret, on his own, the significance of any of these medical tests or

procedures. Rather, he relied, as he should, on the conclusions of her treating physicians. The most recent evaluation performed by a cardiologist revealed that Ms. Durham had "mild systemic disease, no acute problems, and no functional limitations."[25] The same report indicated that she had no cardiac instability. Thus, Ms. Durham's treating cardiologist did all of the interpretation of her exam and procedures; the ALJ simply restated those findings.

Finally, nothing that occurred in April 2019 suggests a material change in Ms. Durham's situation that merited re-submission to a consulting physician. In April 2019, she went to Good Samaritan Hospital due to "exertional shortness of breath and palpitations."[26] Cardiology was consulted, and an EKG and stress test were performed. Her symptoms were resolved with medication, and she was released the following day. This 2019 hospital visit thus bears a significant resemblance to her emergency-room visit in September 2017. At that time, Ms. Durham sought treatment at Good Samaritan Hospital when she experienced shortness of breath and chest pains. Her caregivers administered metoprolol and discharged her with a prescription and instructions to follow up with treating physicians. When she followed up with Ms. Locey and Dr. Ibrahim, she reported that her palpitations largely were controlled, and that she had experienced no fainting, chest pain, or breathing issues. Thus, in both 2017 and 2019, Ms. Durham experienced some additional symptoms for a short period of time, no new issues were discovered, and her

---

[25] *Id.* at 21 (ALJ's opinion); *id*. at 660 (report) (capitalization removed).

[26] *Id.* at 579.

medications were adjusted. Her 2019 hospital visit cannot be characterized as having presented "new" developments, much less potentially dispositive ones, that require an additional opinion of a medical expert. *See Pavlicek v. Saul*, 994 F.3d 777, 783–84 (7th Cir. 2021) (evidence of bodily tremors that resulted in emergency room visits did not require new medical opinion because treatment notes regarding tremors were in the record during agency physician's review).

In sum, although Ms. Durham claims that the testing done in April 2019 rendered the medical opinions stale, the results of that testing—as interpreted by her physicians, not the ALJ—do not reveal a worsening of her condition such that resubmission to a medical expert was required.

**B**.

Ms. Durham also faults the ALJ for failing to include in his hypothetical question "any … time off task to address [Ms. Durham's] ventricular tachycardia."[27] According to Ms. Durham, the ALJ's failure to include this limitation—or any limitation addressing her "spells"—renders his conclusion unsustainable.[28]

An ALJ must include in his hypothetical question "all of a claimant's limitations supported by the medical record." *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021). Here, however, there is no evidence in the record to support a time-off-task limitation. Ms. Durham testified that her spells happen "frequently" and that she needs to "prop [her] feet up" when

---

[27] Appellant's Br. 19.

[28] *Id*. at 22.

she feels dizziness coming on.[29] However, the ALJ noted that this aspect of Ms. Durham's testimony was not supported by any medical record, and Ms. Durham has not invited our attention to any. Moreover, during the hearing, Ms. Durham's counsel did not elicit any further evidence about the "frequency" of the spells or how long they last.

Furthermore, contrary to Ms. Durham's assertion, the ALJ did include limitations in his hypothetical question that accounted for Ms. Durham's tachycardic events. Ms. Durham testified that she experiences "spells" upon exertion, especially in the heat. The ALJ therefore limited Ms. Durham to sedentary work and further provided that she could not be exposed "to extreme heat or humidity."[30] Additionally, the ALJ limited Ms. Durham to jobs where, if she experienced a "spell," she would not pose a danger to herself or to others. Specifically, the ALJ noted that she could never climb "ladders, ropes, and scaffolds"; "must avoid unprotected elevations"; and could not be near "dangerous moving machinery."[31] Indeed, these limitations went beyond those imposed by any medical opinion.

The burden was on Ms. Durham to "prove she is disabled by producing medical evidence." *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021). However, she has failed to come forward with medical evidence to establish that her tachycardia would impede her ability to do sedentary work or that it required

---

[29] A.R. 40–42.

[30] *Id*. at 57.

[31] *Id*.

any limitations beyond those set forth by the ALJ in his hypothetical question.

## Conclusion

Here, the ALJ thoroughly reviewed Ms. Durham's medical history. He did not ignore relevant evidence or fail to include necessary limitations in his hypothetical question to the vocational expert. His decision was supported by substantial evidence. We therefore affirm the judgment of the district court denying benefits.

AFFIRMED