# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 09-3088

ALENA DENTON,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE,
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 08 C 2134—**Harold A. Baker**, *Judge*.

ARGUED JANUARY 26, 2010—DECIDED FEBRUARY 25, 2010

Before BAUER, POSNER, and KANNE, *Circuit Judges*.

PER CURIAM. Alena Denton applied for disability bene-
fits for the two-year period between April 2004 and
March 2006, claiming that she could not work because
of fibromyalgia, hypothyroidism, and depression. Ac-
cording to Denton's treating physician, Denton could not
work because she could lift and carry less than ten
pounds and could not reach overhead. The administra-

tive law judge (ALJ) agreed with these physical constraints—but concluded that even with these limitations
there were still more than 26,000 positions within her
capacity. On appeal Denton contends the ALJ reached this
conclusion only by improperly ignoring the symptoms of
her depression and other evidence suggesting disability.
The ALJ did, however, assess all this evidence, and his
conclusion was reasoned and supported by substantial
evidence. Accordingly, we affirm.

## I. BACKGROUND

Denton, 38 years old at the alleged onset of disability,
worked as a hand packager when pain from lifting
began to affect her. In August 2003 she began to experience right elbow pain, especially when lifting 50-pound
bags at work. Her family doctor diagnosed right medial
epicondylitis (also known as "golfer's elbow"), told her
to lift no more than 10 pounds, and placed her on light
duty at work. Yet a month later, she continued to report
elbow pain. The family doctor told her to stop working
temporarily and attend physical therapy. The next
month the doctor released Denton to light duty at work
for 4-hour shifts, with a 10-pound lifting restriction.

Her pain continued, though, so her doctor referred
Denton to an orthopedist. The orthopedist also diagnosed right medial epicondylitis, prescribed naproxen
and a steroid shot, and gave Denton an elbow brace.
He told Denton to avoid repeatedly using her right arm
and to lift no more than five pounds. Although Denton's
pain improved after the injection, she continued to have

forearm pain, which prompted the orthopedist to order two further tests, an electromyogram (EMG) and magnetic resonance imaging (MRI). These revealed possible carpal tunnel syndrome and mild degenerative changes.

By April 2004, the date that Denton claims her disability started, Denton had stopped working altogether, citing the unavailability of light-duty work. Because the orthopedist believed that neither the EMG nor the MRI could fully explain Denton's continued pain, he referred Denton to Dr. Ruth Craddock, a rheumatologist, for a second opinion.

Denton first visited Craddock in June 2004. At that time Craddock noted tenderness in Denton's forearms and in several other areas. Craddock observed, though, that Denton had full range of motion and full grip strength. Craddock concluded that Denton originally sustained an overuse injury that had developed into fibromyalgia.[1] In addition, after observing an abnormal thyroid function, Craddock theorized that if Denton were developing hypothyroidism, it would help explain her musculoskeletal pain.

---

[1] Fibromyalgia is typically diagnosed by a showing of pain in 11 of 18 specified tender-point sites. Pain is assessed on a four-point scale, with two points indicating moderate or greater pain. *See* Frederick Wolfe, et al., *The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee*, 33 ARTHRITIS & RHEUMATISM 160 (1990), *available at* http://www. rheumatology.org/publications/classification/fibromyalgia/ 1990_Criteria_for_Classification_Fibro.pdf.

Craddock repeated these findings about fibromyalgia a month later and advised her that she could nonetheless seek work. Specifically Craddock told Denton that she could seek "retraining along the lines of office work or something that would not result in such repetitive motion to the right upper extremity." When Denton continued to report tenderness in August 2004, Craddock prescribed Lexapro to relieve the pain, but did not alter the conclusion that Denton could perform non-repetitive office work.

Denton told Craddock that she was not working or using her arms because of pain, and asked Craddock to list Denton's limitations on her long-term disability insurance claim. Craddock wrote in October 2004 that Denton was fatigued, but nonetheless had an unlimited ability to sit, and could stand and walk. Denton could lift and carry ten pounds and push and pull five pounds, but only with her left hand. She could not lift, carry, push, or pull with her right hand. Craddock also said that Denton could not tolerate temperature extremes, wet or humid conditions, vibration, odors, fumes, or particles. She also could not work around heavy machinery because her medicine made her dizzy. Finally Craddock again speculated to Denton that hypothyroidism might be a significant cause of her symptoms but did not prescribe medication for her thyroid.

To treat her continuing pain, in October 2004 her family physician prescribed physical therapy and a transcutaneous electrical nerve stimulation unit. Examination by Craddock three months later continued to

reveal some tenderness, though Denton was "far less tender" the following month. Four months later, in June 2005, Denton's gynecologist prescribed Synthroid for Denton's potentially worsening hypothyroidism.

After applying for disability benefits, Denton was directed to see Dr. Jerry Boyd for a consultive psychological evaluation in July 2005, to whom she reported that she had been depressed for the past year. Boyd found normal memory and intellectual functioning, and no evidence of hallucinations, delusions, psychosis, or paranoia. He concluded that she had a depressive disorder, but that it was in partial remission because of her Lexapro regimen. He also assigned a Global Assessment of Functionality (GAF) score of 60. A review of Boyd's evaluation by another state agency psychologist concluded that Denton did not have a severe mental impairment.

In September 2005, two months later, Denton visited Craddock again. The doctor adjusted Denton's medication based on her reported overwhelming fatigue and muscle tenderness. Craddock opined during this visit that Denton's fatigue and pain precluded her from working overtime, but again she did not exclude all regular-hour work.

In January 2006, without visiting Craddock, Denton requested that she complete a "fibromyalgia worksheet." On that form, Craddock confirmed that Denton suffered from fatigue, sleep disturbance, and morning stiffness, and noted that Denton suffered from pain at a number of tender points. In her handwritten notes, Craddock added

that Denton "remains disabled, unable to do her job @ this time." A "Residual Functional Capacity Report" that Craddock completed the same day concluded, without citing any clinical tests, that Denton was unable to perform a sedentary job as "defined by Social Security regulations." Craddock also noted that Denton would require more than one hour of break time during an eight-hour work shift and that Denton could be expected to miss about three days of work each month.

Denton next visited Craddock in March 2006 and then again in August 2006. At the March visit, Craddock adjusted Denton's pain medication because she continued to report pain and fatigue. By August Craddock summarized Denton's past ability to work: "I have stated on multiple occasions that [Denton] should probably be able to return to work in some capacity," and though she could not return to her previous work, she should be able to perform "fairly sedentary activity."

Denton claims that she was disabled from April 10, 2004 through March 15, 2006. In a 23-page order, the ALJ detailed the decision to deny disability benefits. The ALJ found that Denton had severe impairments, namely fibro-myalgia and hypothyroidism but not depression. In determining Denton's residual functional capacity (RFC), the ALJ relied primarily on the October 2004 evaluation by Craddock, finding that Denton could not lift, carry, push, or pull more than five pounds but could sit, stand and walk. The ALJ also determined that Denton could only occasionally reach with her right arm, frequently reach with her left arm, but never reach overhead with

either arm. Finally, the ALJ also adopted Craddock's opinion about Denton's environmental constraints and restrictions around unprotected heights and hazardous machinery.

Based on these limitations, the ALJ agreed with Denton that she could not return to her previous work as a hand packager. But consistent with the vocational expert's testimony and Craddock's opinions during all of Denton's office visits from 2004 to August 2006 (though contrary to the form Craddock completed in January 2006 without seeing Denton), the ALJ concluded that Denton could engage in some but not all sedentary work. The ALJ specifically identified sedentary work as a surveillance system monitor or circuit board screener—and that more than 26,000 of these positions exist in Illinois. Accordingly, the ALJ concluded that Denton was not disabled for the period of April 10, 2004 to March 15, 2006.

The Appeals Council denied review. On judicial review, the magistrate judge recommended that the ALJ's decision be affirmed, and the district court adopted the report, affirming the Commissioner's decision.

## II. ANALYSIS

Denton's appeal generally focuses on two claimed deficiencies with the ALJ's decision: (1) the ALJ failed to consider adequately all the evidence of her depression-related symptoms and (2) the ALJ's decision is not based on substantial evidence.

### 1. *Consideration of Depression*

First, Denton argues that the ALJ erred by not considering the symptoms of her depression, and the related factors of her fatigue, sleep difficulties, when formulating her residual functional capacity. When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment. 20 C.F.R. § 404.1523; *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). A failure to fully consider the impact of non-severe impairments requires reversal. *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

The ALJ did fully consider the impact of her depression and the related symptoms, both in discussing whether her depression was a severe impairment (a point Denton no longer presses) and also in the context of their affect on her fibromyalgia. Specifically, the ALJ noted that Denton did not seek out treatment for depression during the period of purported disability. Further, she never mentioned lack of interest in activities, social isolation, or mood swings to her treating doctors. (Her brief cites only reports of these symptoms on disability applications and not in medical reports.) Denton bears the burden of producing medical records showing her impairment, and if she never sought medical treatment for a condition, then she cannot meet that burden. 20 C.F.R. § 404.1512(c); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). And the other symptoms that Denton did mention to her treating doctors—her trouble sleeping

and fatigue—were also addressed by the ALJ in formulating the RFC. Although Denton contended that her fatigue prevented her from working full time during the period of disability, the ALJ concluded that Craddock's evaluation did not support this finding because her evaluation suggested only a limitation on *overtime* work because of fatigue.

Denton next claims that the ALJ gave insufficient weight to Craddock's January 2006 evaluation. She argues that this evaluation shows that her depression left her "disabled," unable to perform sedentary work, and likely to miss three days of work monthly. Denton concludes that this opinion should have received controlling weight because Craddock was her treating physician. Denton is incorrect. First, the opinion of a treating physician is entitled to controlling weight only if supported by objective medical evidence. 20 C.F.R. § 404.1527(d)(2). And the ALJ is not required to give controlling weight to the ultimate conclusion of disability—a finding specifically reserved for the Commissioner. *Id.* § 404.1527(e)(1); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

Here, the conclusions about no sedentary work and missing days of work were not based on objective evidence and contradicted two of Craddock's earlier evaluations that were: More than a year earlier, in mid-2004, Craddock reported that Denton could perform non-repetitive office work, and a year later, in September 2005, she concluded that Denton could not work *overtime* (implying that mere full-time work was possible). Even though a claimant's condition may worsen, a

medical expert is obligated to point to objective medical evidence to explain the worsening prognosis. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (concluding that the ALJ was entitled to discount an opinion when the physician did not identify medical evidence that would support the greater limitation). In this case, Craddock did not do that. She wrote the January 2006 report in the middle of a six-month stretch during which Craddock did not examine Denton, and Craddock cites to no objective medical evidence for her conclusions that Denton could not perform sedentary work or would miss three days of work per month. *See, e.g., Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005) (disregarding contention that claimant would require three days off per month when there was no elaboration or explanation for that conclusion); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (disregarding contention that claimant would miss 20 days of work each year without explanation).

Beyond this, Denton also ignores that not long after the January 2006 report, Craddock stated again that Denton has indeed been able to work. Craddock commented in August 2006 that, upon examining Denton on *multiple* earlier occasions, she believed that Denton could return to work. Craddock saw Denton only once after her period of purported disability, so Craddock's comment that she found Denton able to work on "multiple occasions" includes the period of her claimed disability and is inconsistent with Craddock's clinically unsubstantiated assessment in January 2006 that Denton could not perform sedentary work. Accordingly the ALJ did not err

in discounting Craddock's evaluation in January 2006 about no sedentary work and possible missed days of work. *See* 20 C.F.R. § 404.1527(d)(2); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (noting that the ALJ may discount treating physician's opinions that are internally inconsistent).[2]

The ALJ's view of how depression affected Denton's RFC was also consistent with the opinion of the state agency psychologist, Dr. Boyd. Boyd concluded that although Denton had a depressive disorder, it was in partial remission because she took Lexapro for her fibromyalgia. Despite her remitting depression, Boyd pointed to no limitation on her ability to work, concluding that she could follow moderately complex instructions. The ALJ was entitled to rely on medical experts when no contrary evidence is presented. *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004).

Denton also contends that the ALJ erred by refusing to consider Boyd's GAF score of 60. GAF scores, defined in AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (Text Revision, 4th ed. 2000), are "useful for planning treatment," and are measures of both severity of symptoms *and* functional level. *Id.* at 32. Because the "final GAF rating always

---

[2] In her appellate brief, Denton also relies on Craddock's January 2005 letter to Denton's insurance company, but because that letter was not provided to the ALJ, it is not part of the record on review. 42 U.S.C. § 405(g); *Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004).

reflects the worse of the two," *id.* at 33, the score does not reflect the clinician's opinion of functional capacity. Accordingly, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Wilkins v. Barnhart*, 69 F. App'x 775, 780 (7th Cir. 2003) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). Rather than rely on the unexplained numerical score assigned by Boyd, the ALJ's ultimate finding of no disability was substantially supported by Boyd's narrative finding that Denton had no significant mental impairments.

Finally, Denton focuses on her use of Lexapro as establishing the extent of her depression. Although Lexapro is an antidepressant, Denton was prescribed it to treat her fibromyalgia, not depression. And even if Denton had been taking Lexapro for depression, that would not warrant inclusion in her RFC if the prescription controlled her depression, as the evidence suggested. *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (concluding that depression was not disabling because it was controlled).

## 2. Substantial Evidence

Second, apart from the issue of depression, Denton contends that the ALJ's finding of no disability was not supported by substantial evidence because the ALJ ignored her hypothyroidism, her experience with physical therapy, and her tender-points diagnostic (which produced the fibromyalgia diagnosis). An ALJ has the

obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). But an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008).

The ALJ specifically addressed all the evidence that Denton points out, though he did not assign the significance to it that Denton prefers. The ALJ described Denton's battle with hypothyroidism and considered it a severe impairment. But because the record contains only sporadic references to thyroid function, and only speculation on the potential impact that thyroid function might have on her condition, the ALJ was unable to conclude that her thyroid function affected her ability to work. Furthermore, Denton took Synthroid for hypothyroidism in June 2005, and after that point there is no mention of hypothyroidism or its symptoms in the medical record. On this record, the ALJ did not err in concluding that the condition was well-controlled and not affecting her capacity to work. *See Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994) (noting that the claimant "must furnish medical and other evidence that the ALJ can use to reach conclusions about his medical impairment and its effect on his ability to work on a sustained basis.")

Likewise, Denton's disagreement with the significance that the ALJ attributed to her physical therapy and

fibromyalgia is meritless. The ALJ detailed Denton's attempts at physical therapy, noting that despite regular therapy, Denton was unable to resolve fully her pain and lack of mobility in her arms. The ALJ accepted Denton's and her doctor's conclusions that, because of pain, she was limited in her ability to push, pull, lift, and carry, imposing a limitation even more onerous than suggested by Craddock in October 2004. The ALJ accepted Craddock's opinion that Denton's fibromyalgia prevented her from performing the full range of sedentary work. But "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of 'disabled.'" SSR-96p, 61 Fed. Reg. 34,478, 34,479 (July 2, 1996); *Buchholtz v. Barnhart*, 98 F. App'x 540, 547 (7th Cir. 2004); *Lauer v. Apfel*, 169 F.3d 489, 493 (7th Cir. 1999). The ALJ, relying on Craddock's October 2004 evaluation, and the testimony of the vocational expert, concluded that *despite* her limitations Denton could perform full-time work.

## III. CONCLUSION

Accordingly, we AFFIRM the judgment of the district court.