In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-2236
DENNIS LEE BAKKE,
 Plaintiﬀ-Appellant,
 v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,
 Defendant-Appellee.
 ____________________

 Appeal from the United States District Court for the
 Western District of Wisconsin.
 No. 3:21-CV-178-BBC — Barbara B. Crabb, Judge.
 ____________________

 ARGUED FEBRUARY 16, 2023 — DECIDED MARCH 13, 2023
 ____________________

 Before RIPPLE, SCUDDER, and ST. EVE, Circuit Judges.
 ST. EVE, Circuit Judge. Dennis Lee Bakke’s severe back pain
impacts both his quality of life and his ability to work. It led
him to apply for disability beneﬁts in 2019. When this request
was denied, he had a hearing before an administrative law
judge (“ALJ”), who found that Bakke could still work full
time. He sought review in the District Court for the Western
2 No. 22-2236

District of Wisconsin, where the judge aﬃrmed the denial as
supported by substantial evidence. He now appeals.

 I. Background
A. Factual History
 Bakke, a Wisconsin beef farmer, began suﬀering from se-
rious back pain in 2017. At ﬁrst, epidural steroid injections
eased the pain. But over time, the steroids oﬀered less and less
relief. After his fourth injection, Bakke saw little to no im-
provement, and by April 2018, he was “very limited in all ac-
tivities of daily living.” He decided to consult with a surgeon
regarding other treatment options.
 After a consultation with surgeon Mark Dekutoski, Bakke
decided to move forward with a spinal fusion surgery in May.
And the operation helped. Despite some persistent pain and
numbness, Bakke was able to walk increasing distances and,
by June 2018, was cutting back on his pain medication. Bakke
reported that his pain was lessening, he was getting stronger,
and he was able to use his farm equipment for short periods
of time. Doctors encouraged him to continue physical therapy
for another four to six weeks. And by his July 2018 physical,
Bakke reported “signiﬁcant improvement,” stood taller than
he had pre-surgery, and had lost weight. Nevertheless, his
doctor described him as “slow to recover.”
 Around the same time, Bakke began missing physical
therapy appointments. He stopped going altogether in July.
By December, “the pain in his back ha[d] gotten more in-
tense,” “becoming ‘unbearable.’” He had also gained more
than forty pounds since his improvements and weight loss in
July, exacerbating his symptoms. In response, the doctor pre-
scribed him a new pain medication. The new medication
No. 22-2236 3

helped, but Bakke remained “fairly limited”. The pain
changed his life in tangible ways: he sold his farm because the
upkeep was too physically demanding; and hunting trips,
previously a regular activity for Bakke, left him in severe pain.
Around February 2019, Bakke returned to physical therapy.
 As his pain persisted, Bakke underwent a variety of med-
ical tests and examinations relevant to this appeal. Two state
agency physicians examined him. First, in April 2019, Dr.
Marc Young evaluated him and concluded that Bakke was ca-
pable of light, full-time work. The following month, Bakke
had a nerve test called an electromyography (“EMG”). Dr. Sai
Nimmagadda, another state agency physician, considered the
EMG and found that it was an “abnormal study.” Neverthe-
less, he concluded, like Dr. Young, that Bakke was capable of
light, full-time work.
 In June 2019, Bakke began receiving steroid injections in
his back again. Although he saw signiﬁcant improvement in
the ﬁrst week post-injection, the pain returned within three
weeks. Bakke also reported that his pain medication was help-
ing less than it had previously. His general practitioner, Dr.
Andrea Peterson, ordered a test in August 2019 called a com-
puted tomography (“CT”) myelogram. Bakke’s surgeon, Dr.
Dekutoski, subsequently reviewed the CT myelogram and
recommended only physical therapy and weight loss.
 That October, Bakke saw Nurse Practitioner Amelia Zell-
ner for a “follow up [on] his medications for chronic low back
pain.” He reported mostly good news: his medication was
helping. He was able to sleep “and [said] he actually wakes
up in the morning feeling reasonably well” with “minimal
pain and stiﬀness in the morning.” In a subsequent February
2020 visit with the same nurse, Bakke reported that his pain
4 No. 22-2236

was “under reasonably good control.” “[H]e [was] able to do
most of the things he want[ed] to do[,] [h]e continue[d] to help
with farm work, [he was] quite active in the woods, and [he
went] deer hunting.” According to Nurse Zellner’s notes, he
was even able to snowshoe into the woods to tap maple trees
with his family.
 Bakke had two more medical evaluations in 2020 that are
of note. In April, he had a telehealth appointment with Dr.
Peterson. She concluded that he could tolerate no more than
four hours of work per day—a permanent work restriction.
And in July, Bakke was referred to a new surgeon, Dr. Vive-
kananda Gonugunta. Dr. Gonugunta did not make any spe-
ciﬁc ﬁndings about Bakke’s capacity for work. Instead, he “re-
assured [Bakke] that [he] d[id] not see any evidence of com-
plications of surgery.” The doctor further noted that “it is not
unusual to have persisting back pain or leg/thigh numbness
after multilevel fusion surgery along with lateral interbody
fusions.” He called the surgery “excellent” and concluded
that Bakke was “deﬁnitely better than before surgery.”
B. Procedural History
 Bakke ﬁrst ﬁled a request for disability beneﬁts in the
spring of 2019. His request was denied in April of that year.
Bakke subsequently had a hearing before an ALJ on August
19, 2020.
 At his hearing, Bakke testiﬁed about his own symptoms.
He described intense pain, with some days so bad he could
not get out of bed. He told the ALJ that he could not sit for
more than two hours, which made it diﬃcult to drive. He
stated that he could not sustain work because the pain made
it impossible for him to sit or stand for long periods of time,
No. 22-2236 5

often requiring him to lay down to get through the day; on
top of that, he said he could not lift or carry much weight.
Taken together, Bakke explained these factors made it diﬃcult
to ﬁnd employment. But he also struggled personally because
of the pain. Bakke said he had a hard time going up and down
the stairs because numbness in his left leg made him unsteady
on his feet. And the inability to sit or stand for long periods of
time made it diﬃcult to attend his son’s basketball games,
where he could not comfortably sit in the bleachers.
 After reviewing the record evidence and Bakke’s testi-
mony, the ALJ performed the Social Security Administra-
tion’s required ﬁve-step disability analysis: First, the ALJ con-
siders whether the claimant is engaged in substantial gainful
activity. If the claimant is not, the ALJ asks whether the claim-
ant suﬀers from any “severe” impairments. If so, the ALJ pro-
ceeds to the third step—deciding whether any impairments
meet or equal the impairments listed in 20 C.F.R. Part 404 (a
particular set of impairments that warrant disability beneﬁts).
If not, the ALJ determines the claimant’s “residual functional
capacity”—that is, his ability to perform work. And ﬁnally, in
light of the claimant’s residual functional capacity, the ALJ
must decide whether jobs which the claimant can perform ex-
ist in signiﬁcant numbers in the national economy. Wilder v.
Kijakazi, 22 F.4th 644, 651 (7th Cir. 2022) (quoting Butler v. Ki-
jakazi, 4 F.4th 498, 501 (7th Cir. 2021)).
 Here, the ALJ agreed that Bakke could not engage in sub-
stantial gainful activity due to his back injury and obesity but
concluded that his impairments were not as severe as those
listed in 20 C.F.R. Part 404. Next, he considered Bakke’s resid-
ual functional capacity and determined that he could still per-
form light, full-time work. And after considering the
6 No. 22-2236

vocational expert’s testimony, the ALJ decided that light, full-
time work was available in signiﬁcant numbers in the national
economy, precluding a ﬁnding that Bakke was disabled.
Bakke appealed, and the district court aﬃrmed the denial as
supported by substantial evidence. This appeal followed.
 II. Analysis
 While “we assess the ALJ’s legal conclusions de novo,”
our factual review is limited. Poole v. Kijakazi, 28 F.4th 792, 794
(7th Cir. 2022). “We will aﬃrm a decision on disability bene-
ﬁts [so long as] the ALJ supported her conclusion with sub-
stantial evidence.” Karr v. Saul, 989 F.3d 508, 511 (7th Cir.
2021). This “is not a high threshold, as it means only ‘such rel-
evant evidence as a reasonable mind might accept as adequate
to support a conclusion.’” Prill v. Kijakazi, 23 F.4th 738, 746 (7th
Cir. 2022) (quoting Karr, 989 F.3d at 511). “An ALJ need not
speciﬁcally address every piece of evidence, but must provide
a ‘logical bridge’ between the evidence and his conclusions.”
Butler, 4 F.4th at 501 (citation omitted).
 Bakke’s arguments all attack the same conclusion by the
ALJ in the fourth step of the disability analysis: that despite
his back pain, Bakke’s “residual functional capacity” allowed
light, full-time work. Bakke believes the ALJ erred in three
ways: it (1) over-credited the state agency physicians’ opin-
ions; (2) improperly discredited the opinion from Bakke’s per-
sonal physician; and (3) improperly dismissed Bakke’s sub-
jective symptoms. Because none of these arguments warrants
reversal on our deferential review and because the ALJ’s de-
cision is supported by substantial evidence, we now aﬃrm.
No. 22-2236 7

A. State Agency Physicians
 According to Bakke, the ALJ erred in crediting the conclu-
sions of the state agency physicians, Drs. Young and Nim-
magadda. He maintains that the doctors did not take all of
Bakke’s medical testing into account and that the ALJ did not
properly explain why their opinions were reliable.
 1. Medical Evidence Considered
 Bakke contends ﬁrst that the state agency physicians’
opinions were not well-founded because the doctors made
their conclusions based on outdated medical information. He
argues that because neither Dr. Young nor Dr. Nimmagadda
had access to his 2019 CT myelogram1 when determining his
residual functional capacity, their assessments lacked critical
information and were unreliable.
 “An ALJ should not rely on an outdated assessment if later
evidence containing new, signiﬁcant medical diagnoses rea-
sonably could have changed the reviewing physician’s opin-
ion.” Moreno v. Berryhill, 882 F.3d 722, 728 (7th Cir.), as
amended on reh'g (Apr. 13, 2018); Deloney v. Saul, 840 F. App'x
1, 5 (7th Cir. 2020). But older assessments can still constitute
“substantial evidence” supporting the ALJ’s decision where
the new tests do not “necessarily undermine [previous

 1 Bakke also contends that the March 2019 EMG was “never evaluated

by a medical expert to determine the impact of those ﬁndings on the re-
sidual functional capacity.” This is simply untrue. Dr. Nimmagadda did
review this EMG and analyze it as part of Bakke’s disability application.
In his notes, he writes explicitly: “seen for Nerve Conduction Study/EMG
Report.” A detailed analysis, including discussion of the EMG, precedes
Dr. Nimmagadda’s conclusion that Bakke is capable of light work.
8 No. 22-2236

medical] conclusions.” Pavlicek v. Saul, 994 F.3d 777, 784 (7th
Cir. 2021).
 The 2019 CT myelogram did not include the kind of “new
diagnosis” that would undermine previous conclusions about
Bakke’s disability status. Although Drs. Young and Nim-
magadda were not able to review the myelogram, at least two
doctors did. Neither found it concerning or noted a signiﬁcant
impact on Bakke’s functional capacity. First, Dr. Dekutoski,
who performed Bakke’s surgery, reviewed the results with
Bakke personally. Upon review and comparison to past im-
ages, the doctor recommended only physical therapy and
weight loss. He did not note that he was concerned, nor did
he increase Bakke’s pain medication or recommend another
surgical intervention. Second, Dr. Gonugunta, the surgeon
who examined Bakke in July 2020, also reviewed the CT my-
elogram. He “reassured [Bakke] that [there was no] evidence
of complications of surgery,” and stated that “[i]t is not unu-
sual to have persisting back pain … after multilevel fusion
surgery.” And critically, he “reassure[d]” Bakke that “there
was nothing serious going on in the spine.” “In fact, [Bakke
wa]s deﬁnitely better than before surgery.”
 These mild reactions show that the CT myelogram was not
a “new, signiﬁcant medical diagnos[is that] reasonably could
have changed the reviewing physician’s opinion,” Moreno,
882 F.3d at 728, and the ALJ was entitled to rely on the state
agency physicians’ opinions, despite the intervening test. 2

 2 It is for the same reason that we reject Bakke’s argument under Akin

v. Berryhill, 887 F.3d 314, 317 (7th Cir. 2018) that the ALJ impermissibly
“played doctor” by interpreting either the March 2019 EMG or the August
2019 CT myelogram without the help of medical expertise. As addressed
No. 22-2236 9

 2. Weighing of Medical Opinions
 Section 404.1520c(c) requires ALJs to explicitly explain
why particular medical opinions are consistent with the rec-
ord as a whole. 20 C.F.R. § 404.1520c(b)(2), (c)(1); see also Lam-
bert v. Berryhill, 896 F.3d 768, 774 (7th Cir. 2018) (noting the
importance of consistency with record evidence under the
previous rule, the “treating-physician rule,” which has been
replaced through revisions to § 404.1520c). As part of this pro-
cess, “[a]n ALJ has the obligation to consider all relevant med-
ical evidence” and not to selectively cite only the evidence
that supports his conclusion. Denton v. Astrue, 596 F.3d 419,
425 (7th Cir. 2010) (per curiam).
 Contrary to Bakke’s contention, the ALJ properly
articulated why the state agency physicians’ opinions were
consistent with other record evidence in compliance with
§ 404.1520c. He compared the state agency doctors’ opinions
that Bakke could perform light work to medical records
showing “imaging studies … [which] showed some abnormal
signs, [but were] overall, … generally unremarkable,”
“examinations … [with] some abnormal signs, but [which]
were, overall, generally unremarkable,” and conservative
post-surgery treatment. 3 The ALJ also analyzed the state

above, the ALJ properly relied on the expert interpretations of the tests
from Drs. Nimmagadda, Dekutoski, and Vivekananda to evaluate Bakke’s
case. He did not independently interpret the tests.
 3 Bakke suggests in passing that the ALJ failed to properly justify his

conclusion that Bakke’s treatment post-surgery was “conservative.” But
the ALJ devoted only three sentences to this portion of the analysis in his
roughly ﬁfteen-page, detailed opinion. And the conservative course of
treatment is clearly not the crux of his conclusion, which emphasizes the
opinions of agency physicians and evidence of Bakke’s improvement over
10 No. 22-2236

agency doctors’ findings in light of Bakke’s own subjective
pain, which was sometimes very severe. The ALJ noted
Bakke’s increased pain and “profound deconditioning.” But
the ALJ also observed that by February 2020, this pain was
“under reasonably good control, noting [Bakke] was able to
do most things he wanted to do.” Nor did the ALJ simply
cherry-pick the record, as Bakke claims—the judge
acknowledged the abnormal scans and exams and noted
increases in Bakke’s subjective pain. But the ALJ found that
the balance of the evidence reflected normal imaging and pain
that was under control according to Bakke’s medical records.
This explicit weighing is precisely within the purview of the
ALJ—and it is not our place to reweigh evidence, even where
reasonable minds might disagree about the outcome. See Karr,
989 F.3d at 513.
B. Dr. Peterson
 As explained above, § 404.1520c requires an ALJ to con-
sider whether a medical opinion is consistent with the record
as a whole. Lambert, 896 F.3d at 774. The same regulation re-
quires an ALJ, in reaching his conclusions, to consider the in-
ternal supportability of a physician’s medical opinion. This
means that ALJs should give more weight to medical opinions
with more internal explanation and support than to those
without. § 404.1520c(c)(1).
 Beginning with § 404.1520c’s consistency prong, Bakke ob-
jects to the conclusion that Dr. Peterson’s opinion was “gen-
erally inconsistent with the overall record.” But the ALJ

time. Accordingly, any possible error is harmless and does not warrant
remand. Schomas v. Colvin, 732 F.3d 702, 707 (7th Cir. 2013) (such argu-
ments are subject to harmless error review).
No. 22-2236 11

articulated why it found Dr. Peterson’s opinions inconsistent
with the record—her conclusions were “not supported by
[Bakke’s] statements that were made just a few months prior.”
In February 2020, Bakke noted that his pain was under “rea-
sonably good control.” Medical records also reﬂect that “he
[was] able to do most of the things he want[ed] to do … [and
was] quite active in the woods” at that time.
 As for the supportability prong, Bakke argues that the ALJ
erred in ﬁnding that Dr. Peterson “did not provide any rea-
soning or support for [Bakke’s] proposed limitations.” Bakke
points to Dr. Peterson’s April 2020 telehealth evaluation,
which includes a list of symptoms, treatments, and medical
testing on which she relied during the evaluation. But Bakke
misapprehends the ALJ’s rejection of Dr. Peterson’s conclu-
sions—it is not that Dr. Peterson did not rely on any medical
evidence. He rejected her conclusions because she failed to ex-
plain the link between the medical evidence she listed and the
recommended work restrictions. In fact, every test result on
which Dr. Peterson relied in her analysis had been noted on
Bakke’s chart since at least August 2019. It was reasonable for
the ALJ to expect an explanation as to why Dr. Peterson sud-
denly recommended a permanent work restriction based on
tests that were more than six months old.
 In sum, the ALJ examined Dr. Peterson’s medical opinions
for consistency with the record and internal supportability
and found them lacking, articulating each of those analyses in
his opinion. 4 He therefore did not err in choosing to discount

 4 Bakke mentions brieﬂy that Dr. Peterson’s opinion warranted more

consideration because of her role as Bakke’s treating physician. But treat-
ing physicians’ opinions are not given controlling weight in claims ﬁled
12 No. 22-2236

Dr. Peterson’s opinions and credit the state agency physi-
cians’ conclusions. See Karr, 989 F.3d at 513 (aﬃrming the re-
jection of one doctor’s opinion as “extreme” in light of the
other evidence in the record, even though that doctor had re-
viewed at least one MRI that no other doctor had reviewed).
C. Bakke’s Symptoms
 In his last set of challenges, Bakke argues that the ALJ
failed to build a “logical bridge” between the record evidence
and his conclusions about Bakke’s subjective experience and
abilities, as our case law requires. Butler, 4 F.4th at 501.
 1. Subjective Pain
 Bakke ﬁrst criticizes the ALJ’s conclusions about how well
his pain was being managed. Bakke contends that the ALJ
gave a selective summary of the evidence, ignoring records
and hearing testimony indicating that he was signiﬁcantly im-
paired. 5

after March 27, 2017. Cf. Karr v. Saul, 989 F.3d 508, 511 (7th Cir. 2021);
§ 404.1520c. Here, the ALJ clearly acknowledged Dr. Peterson’s role as
Bakke’s treating physician and was not required to articulate exactly how
he accounted for that relationship in his ﬁnal decision, so long as he
properly articulated his consistency and supportability analyses.
§ 404.1520c(b)(2). As explained above, the ALJ did exactly that. Any sug-
gestion that Dr. Peterson’s role as treating physician means the ALJ erred
is incorrect.
 5 He especially criticizes reliance on statements about his pain made

during an annual physical, which he argues should be discounted because
the appointment was not focused on his pain management. But Bakke had
previously visited that same nurse for consultations on pain management.
It was logical for the ALJ to credit Bakke’s statements to the nurse
No. 22-2236 13

 An ALJ cannot rely solely on the parts of the record that
support his opinion in reaching his conclusion. Bates v. Colvin,
736 F.3d 1093, 1099 (7th Cir. 2013). But he also “need not men-
tion every piece of evidence, so long he builds a logical bridge
from the evidence to his conclusion.” Denton, 596 F.3d at 425.
“In other words, as with any well-reasoned decision, the ALJ
must rest its denial of beneﬁts on adequate evidence con-
tained in the record and must explain why contrary evidence
does not persuade.” Berger v. Astrue, 516 F.3d 539, 544 (7th Cir.
2008).
 Here, the ALJ repeatedly acknowledged both the positive
and negative developments in Bakke’s condition that could be
gleaned from each medical document. He pointed to some
“abnormal signs” in Bakke’s scans; occasional changes in gait
and strength; “absent reﬂexes; a limited range of motion; ten-
derness; and the inability to do a single heel raise.” But the
ALJ also pointed to sixteen separate documents reﬂecting
normal gait, strength, reﬂexes, and range of motion. The ALJ
pointed to variations in Bakke’s reported level of pain and im-
provements over several months in Bakke’s pain manage-
ment, but also acknowledged “signiﬁcant left thigh numbness
with persisting low back pain;” “postur[e] that was quite ab-
normal; an antalgic gait; a signiﬁcantly decreased range of
motion; and decreased sensation in the left anterolateral
thigh.” And although the ALJ did not mention every state-
ment from Bakke’s testimony, he did acknowledge Bakke’s
diﬃculty sitting and walking, the need to lay down

practitioner who prescribed him several of his pain medications and had
previously met with him about pain management.
14 No. 22-2236

throughout the day, and the fact that Bakke could not lift
more than a bag of groceries.
 With these repeated acknowledgments of Bakke’s im-
provements and setbacks, this is not a case of cherry-picking
evidence. Rather, Bakke’s objection is that the ALJ “did not
assign the signiﬁcance to [certain evidence] that [Bakke] pre-
fers.” Denton, 596 F.3d at 426. Where the ALJ clearly notes all
evidence—that which supports his conclusion and that which
undermines it—we cannot replace his judgment with ours.
 2. Treatment of his Obesity
 Finally, relying on Barrett v. Barnhart, 355 F.3d 1065, 1068
(7th Cir.), on reh’g, 368 F.3d 691 (7th Cir. 2004), Bakke argues
that the ALJ improperly held his obesity against him,
“impl[ying] some malevolence to his deconditioning without
considering that his medically determinable impairment,
pain, or surgery may have been the reason for it.” In Barrett,
this Court remanded the case where an ALJ seemed to have
discounted obesity’s exacerbation of other impairments,
treating it instead as a self-imposed problem, independent
from disabling impairments. 355 F.3d at 1067–68. Since Bar-
rett, we have clariﬁed that ALJs properly account for a claim-
ant’s obesity by acknowledging the ways that obesity can im-
pact and compound each of the claimant’s impairments. See
Brown v. Colvin, 845 F.3d 247, 251 (7th Cir. 2016).
 To support his claim that Barrett controls, Bakke points
only to the ALJ’s statement that he was “profoundly decondi-
tioned.” 6 But the reference to Bakke’s “profound

 6 This is the entirety of Bakke’s obesity position. We likely need not

address such a perfunctory argument. Nelson v. Napolitano, 657 F.3d 586,
590 (7th Cir. 2011) (“Neither the district court nor this court are obliged to
No. 22-2236 15

deconditioning” was not a mechanism to shift blame. Rather,
the ALJ was quoting directly from Bakke’s medical records.
Unlike in Barrett, the ALJ did not discount the claimant’s obe-
sity or its exacerbation of other impairments. 355 F.3d at 1067–
68. To the contrary, the ALJ speciﬁcally noted that “[t]he com-
bined eﬀects of obesity with other impairments may be
greater than might be expected without the disorder.” Thus,
the ALJ viewed Bakke’s obesity as a cause of worsening
symptoms, to be considered throughout the evaluation. And
the ALJ relied on expert medical opinions, each of which in-
corporated Bakke’s obesity in its consideration of his symp-
toms, further guaranteeing that Bakke’s obesity was not ig-
nored. See Pepper v. Colvin, 712 F.3d 351, 364 (7th Cir. 2013).
Accordingly, the ALJ did not err in its consideration of
Bakke’s obesity.
 III. Conclusion
 The ALJ’s opinion is supported by substantial evidence
and logically relates that evidence to his conclusion that
Bakke can perform light work. The decisions of the district
court and the ALJ are therefore
 AFFIRMED.

research and construct legal arguments for parties, especially when they
are represented by counsel.”). But the waiver question makes no diﬀer-
ence, as Bakke fails on the merits.