In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 22-2281

MICHELLE BAPTIST,

*Plaintiff-Appellant,*

*v.*

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:20-cv-03168-SEM-KLM — **Sue E. Myerscough**, *Judge.*

---

ARGUED FEBRUARY 22, 2023 — DECIDED JULY 14, 2023

---

Before HAMILTON, KIRSCH, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge.* Following a car accident in December 2013, Michelle Baptist began experiencing significant neck and shoulder pain, as well as headaches. She applied for Disability Insurance Benefits and Supplemental Security Income the following year. After reviewing her medical records and conducting a hearing, an administrative law judge concluded that Baptist retained the capacity to perform light work and,

therefore, was not disabled. Because substantial evidence supports this decision, we affirm.

## I. BACKGROUND

### A. Factual History

*1. Musculoskeletal Impairments*

The day after her car accident, Baptist, then fifty years old, sought treatment for neck and shoulder pain. An x-ray revealed mild degenerative changes at the C5 through C7 levels of her spine. The treating provider concluded that Baptist had suffered a neck strain and recommended that she avoid lifting more than eight pounds for two weeks.

One month later, Baptist's symptoms had not improved. Her primary care physician, John Lee, M.D., prescribed pain medications and recommended physical therapy. After two months of treatment, however, Baptist's pain remained unchanged. Dr. Lee ordered an MRI in April 2014, which revealed a loss of disc signal, some disc narrowing, and minor annular bulging. He advised Baptist to continue taking prescribed medications, quit smoking, eat healthy food, and engage in regular exercise. A pain specialist offered to administer a steroid injection, but warned that it might not make a difference "given the small[,] tiny amount of disc protrusion" in Baptist's spine.

Throughout 2014 and 2015, Baptist continued to describe significant discomfort. She also complained of hand numbness, reduced range of motion, and muscle weakness. Still, no medical imaging could identify the source of her symptoms. A spinal EMG administered in December 2014 revealed only mild radiculopathy, which the administering physician predicted would improve with conservative treatment.

Joshua Ellison, M.D.—another one of Baptist's primary care physicians—opined that although Baptist's pain seemed to be muscular or neurological, "nothing on objective exams [was] really found to support it." He was unsure whether Baptist was malingering.[1] Despite these misgivings, Dr. Ellison noted that Baptist's complaints were "plausible," and there was "no doubt" that she was unable to work. He completed a disability form to that effect in March 2015, indicating that Baptist could not stand, walk, or sit for even two hours in an eight-hour workday, or lift ten pounds.

When Baptist asked Dr. Ellison to fill out a second disability form later that year, he reiterated in his treatment notes that there was "no objective evidence" that anything was wrong with Baptist. He further stated that it was "obvious" to him that she was not giving full effort during strength tests and suggested that she might have a somatoform disorder.[2] Still, he agreed to document Baptist's subjective complaints in her disability paperwork. This medical source statement, completed in November 2015, again indicated that Baptist had significant limitations, including an inability to stand or walk for more than two hours per day. He qualified, however, that the "severity of [Baptist's] pain and disability [did] not follow her exam findings" and that he suspected Baptist "exaggerate[d]" during exams.

---

[1] Malingering is "the deliberate feigning of an illness or disability to achieve a particular desired outcome." *Malingering*, American Psychological Association Dictionary of Psychology, https://dictionary.apa.org/malingering (last visited July 10, 2023).

[2] A somatoform disorder is a "'psychosomatic' illness: one has physical symptoms, but there is no physical cause." *Sims v. Barnhart*, 442 F.3d 536, 537 (7th Cir. 2006).

Rebecca Wangard, a nurse practitioner in Dr. Ellison's office, also submitted opinions regarding Baptist's capacity to work. Although Wangard completed two forms on the same day in November 2017, she described different limitations in each. In the first, Wangard suggested that Baptist could stand and walk for two hours per day, had no limitations on her ability to sit, and could occasionally lift twenty pounds. In the second, she opined that Baptist could stand and walk for less than two hours per day, sit for about four hours per day, and rarely lift twenty pounds.

Baptist received an updated MRI on March 30, 2018. Two of Baptist's physicians—neurosurgeon Devin Amin, M.D., and pain specialist Louis Graham, M.D.—reviewed the imaging and confirmed that it showed only "minimal" narrowing and a "mild" disc bulge. They recommended Baptist continue with conservative treatment.

### 2. Aneurysms

Around the time of her car accident, Baptist also began complaining of severe headaches. One such headache prompted a visit to the emergency room in August 2014. A CT scan and other tests revealed that Baptist had at least one aneurysm, possibly two. Baptist saw a neurologist, who noted that these were likely unrelated to Baptist's headaches and required only conservative treatment. As a precaution, he advised Baptist not to lift anything heavier than twenty pounds.

About one year later, updated imaging showed that one of the aneurysms had grown and now presented a greater risk of rupture. Baptist's treating neurosurgeon, Dr. Amin, recommended an aneurysm clipping, which Baptist underwent in January 2016. Discharge instructions imposed various

limitations for six weeks, after which Baptist could return to normal activity.

Three weeks after the clipping, Baptist again visited the emergency room. She explained that she had fallen five days earlier and had since been experiencing weakness in her left leg, tingling and numbness in her left arm and leg, and mild vision loss in her right eye. Upon examination, she had full muscle strength and no coordination problems. A CT angiogram and a February 11, 2016 MRI showed an infarct in her right anterior temporal lobe, along with several smaller infarcts.[3] Baptist's treating neurologist, Fazeel Siddiqui, M.D., concluded that Baptist had not experienced a stroke and the infarcts had likely been caused by the clipping. Baptist was advised to resume activity as tolerated.

Twelve days later, Baptist informed Dr. Siddiqui that her left-sided weakness had "resolved spontaneously." Her range of motion was normal, as were her reflexes, motor strength, sensation, and gait. Dr. Siddiqui observed that Baptist was "doing well," and that the infarcts would heal over time. For ongoing treatment, he recommended only aspirin. In April 2016, Dr. Amin confirmed that Baptist had "done quite well from surgery." Baptist reported no issues with gait or balance and her physical examination was normal. Although Baptist continued to complain of headaches, Dr. Amin described these as "stress-related."

At a follow-up appointment one year after the clipping, Baptist again demonstrated full motor strength, intact

---

[3] An "infarct" refers to an area of tissue that dies due to inadequate blood supply. *Infarction*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/infarction (last visited June 28, 2023).

sensation, normal gait, and normal reflexes. According to Dr. Siddiqui, an updated CT scan showed that Baptist's aneurysms were "stable" and there were "no new issues."

### B. Procedural History

Baptist applied for disability benefits in 2014, alleging limitations stemming from back and neck injuries, frequent headaches, hand numbness, aneurysms, and depression. An administrative law judge ("ALJ") held a hearing, at which Baptist appeared and testified without counsel.

The ALJ ultimately denied Baptist's application. Applying the requisite five-step analysis, *see* 20 C.F.R. § 404.1520(a)(4), the ALJ found that although Baptist suffered from severe cervical radiculopathy, she retained the Residual Functional Capacity ("RFC") to perform a full range of light work and to sit, stand, and walk for six hours in an eight-hour period. In light of this RFC, the ALJ concluded that Baptist could continue her past relevant work as a personal assistant and was, therefore, not disabled at any time from the alleged onset date through the date of the decision. The Appeals Council denied further administrative review, making the ALJ's decision the final decision of the Commissioner. On judicial review, the district court affirmed the ALJ's denial of benefits.

## II. ANALYSIS

On appeal, Baptist argues that the ALJ erred in two critical respects when determining her RFC. First, she accuses the ALJ of "playing doctor" when interpreting Baptist's medical records that post-dated the state agency consultants' conclusions that she could perform light work. Second, Baptist contends that the ALJ failed to support her decision to reject the opinions of Baptist's treating medical providers.

We will reverse the decision of an ALJ only if it is based on incorrect legal standards or unsupported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citing 42 U.S.C. § 405(g)). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). We will address each of Baptist's arguments in turn.

### A. Playing Doctor

When state agency medical consultants reviewed Baptist's case file in 2015, they deduced that she could perform a full range of light work and could sit, stand, and walk for six hours per eight-hour workday. Baptist now asserts that the ALJ impermissibly "played doctor" by affording these opinions great weight without seeking an updated medical assessment interpreting Baptist's 2016 aneurysm clipping procedure, the 2016 MRI showing infarcts in her temporal lobe, or her 2018 cervical spine MRI. Baptist believes that the ALJ used her own judgment—rather than a physician's—to conclude that this new evidence was consistent with the state agency consultants' 2015 assessments.

It is well-established that ALJs may not rely on a state agency consultant's assessment if later evidence "reasonably could have changed" the opinion. *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *see also Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where later diagnostic report "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician"); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (remanding where ALJ relied on consulting physician's

conclusions without submitting "new and potentially deci-sive evidence" for additional review).

In this case, however, remand is not required because treatment notes from Baptist's own physicians indicate that neither the 2016 records related to Baptist's brain aneurysm and infarcts, nor the 2018 MRI would have altered the state agency consultants' RFC findings. *See Bakke v. Kijakazi*, 62 F.4th 1061, 1067 (7th Cir. 2023) (an ALJ may rely on older as-sessments when new tests do not necessarily undermine the previous medical conclusions) (citing *Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021)).

### 1. Evidence Related to Baptist's Aneurysms

In their opinions, the state agency medical consultants noted that Baptist's aneurysms were "small" and did "not re-quire any type of treatment at [the] time." Like the neurologist who initially discovered the aneurysms, they recommended limiting Baptist to lifting no more than twenty pounds. Soon after the consultants' review, however, Baptist underwent an aneurysm clipping procedure on January 20, 2016. The fol-lowing month, she presented to the emergency room com-plaining of headaches and left-sided weakness. An MRI re-vealed infarcts in her temporal lobe. Citing these unforeseen events, Baptist argues that the consultants' recommended an-eurysm-related restriction was outdated.

We disagree. Despite initial complications from the aneu-rysm clipping procedure, Baptist's medical records indicate that she made a full recovery and experienced no ongoing an-eurysm-related symptoms. The left-sided weakness that caused Baptist's fall "resolved spontaneously" within a cou-ple weeks and did not return over the next year. The

technician who reviewed Baptist's February 11, 2016 MRI advised that she could resume activity as tolerated. Dr. Siddiqui, Baptist's treating neurologist, also reviewed the MRI. He noted that the infarcts would heal over time and that Baptist was "doing well after the procedure." At follow-up appointments, she consistently presented with full strength and reported no problems with gait or balance. Although Baptist continued to complain of headaches, Baptist's neurosurgeon, Dr. Amin, described them as "stress-related," rather than aneurysm-related. He and Dr. Siddiqui were pleased with Baptist's recovery and did not recommend additional treatment or functional restrictions. A January 2017 CT scan—also reviewed by Dr. Siddiqui—showed that Baptist's aneurysms were "stable" and there were "no new issues."

Thus, within two months of Baptist's clipping procedure, her condition was similar to when the state agency consultants reviewed her file: she had small aneurysms and required no further treatment. This information was conveyed in layman's terms by Drs. Siddiqui and Amin, rather than the "medical mumbo jumbo" we've warned judges not to interpret. *Goins*, 764 F.3d at 680. The ALJ was not required to seek an updated opinion on an impairment that had not worsened since the consultants' review. *See, e.g., Durham v. Kijakazi*, 53 F.4th 1089, 1095–96 (7th Cir. 2022) (evidence of claimant's 2019 hospitalization did not merit re-submission to a consulting physician when it bore "a significant resemblance" to a prior emergency room visit that the consultant had considered); *Pavlicek*, 994 F.3d at 783–84 (ALJ permissibly relied on a physician's opinion that later evidence supported).

*2. Evidence Related to Baptist's 2018 Cervical Spine MRI*

Baptist next argues that the consultants' 2015 opinions regarding her musculoskeletal impairments were similarly outdated in light of her 2018 cervical spine MRI. Like Baptist's 2014 MRI, the 2018 imaging revealed only "mild" multilevel degenerative changes. Unlike the 2014 MRI, the updated imaging showed that the small protrusions in Baptist's spine were abutting (or coming up against) her ventral cord.

It is true that we have been especially critical of ALJs' attempts to deduce the meaning of MRIs without medical assistance. *See, e.g.*, *McHenry*, 911 F.3d at 871; *Goins*, 764 F.3d at 680; *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). It is also true that even evidence of "mild" changes can be potentially decisive in certain circumstances. *See, e.g.*, *Israel v. Colvin*, 840 F.3d 432, 439–440 (7th Cir. 2016) (ALJ was required to seek an updated opinion regarding an MRI showing "mild," "minor," and "minimal" spinal changes to determine whether it supported the claimant's reports of disabling pain).

But when determining whether an opinion is outdated, the critical question is whether the new evidence contains "significant and new developments" that "reasonably" could have changed the previous reviewing consultant's assessment. *Moreno*, 882 F.3d at 728; *see also Goins*, 746 F.3d at 680 (claimant's first MRI in eleven years was potentially decisive because it revealed changes that substantiated her complaints of worsening symptoms and headaches); *Stage*, 812 F.3d at 1125 (non-examining physician's opinion was outdated where new MRI and treating physicians report showed that claimant had a significant hip deformity and needed a hip replacement). There is nothing in the record to suggest the 2018 cervical spine MRI would have had this effect.

Both Dr. Graham and Dr. Amin reviewed Baptist's 2018 MRI. Neither recorded any concerns, nor did they observe any impact the MRI results would have on Baptist's functional capacity. Indeed, they noted that Baptist presented with full upper and lower extremity strength, normal reflexes, a normal gait, and "no overt weakness." Dr. Ellison reviewed these physicians' treatment notes and likewise refrained from prescribing any new functional restrictions. Following the MRI, all three physicians recommended Baptist proceed with her "conservative" treatment plan, which consisted of medications and regular exercise. Drs. Graham and Ellison also recommended injections.

When evidence of mild changes is reviewed by a claimant's treating physicians and unaccompanied by any new symptoms, limitations, or treatment recommendations, we cannot say that it changed the picture so much that the ALJ was required to seek an updated opinion to account for it. *See Bakke*, 62 F.4th at 1067 (treating physicians' "mild reactions" to updated testing showed that it would not have changed state agency consultants' opinions regarding the claimant's functional capacity); *Durham*, 53 F.4th at 1096 (ALJ was not required to submit claimant's updated testing to consultants when "the results of that testing—as interpreted by her physicians, not the ALJ—[did] not reveal a worsening of her condition"). Here, Baptist's treating doctors reviewed the new evidence and determined that she could remain on her current course of treatment. In addition, Dr. Ellison, after reviewing updated treatment records, did not modify his opinion that Baptist may be malingering. Thus, despite the intervening MRI in this case, the ALJ did not err in relying on the assessments of the state agency consultants when formulating Baptist's RFC because their opinions were not outdated.

### B. The Treating Physician Rule

Finally, Baptist asserts that the ALJ failed to adequately support her decision to discount the opinions of her treating physician, Dr. Ellison, and her treating nurse practitioner, Wangard. In particular, Baptist contends the ALJ should have credited these providers' findings that she could not stand or walk for more than two hours in an eight-hour workday.

For claims filed before 2017, such as this one, the opinions of treating physicians are entitled to controlling weight if they are supported by medical evidence and consistent with the record.[4] *See* 20 C.F.R. § 404.1527(c)(2); *Jarnutowski v. Kijakazi*, 48 F.4th 769, 776 (7th Cir. 2022). Conversely, "if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Here, the ALJ offered well-supported reasons for discounting the findings of Dr. Ellison and nurse practitioner Wangard. First, the ALJ highlighted the explicit qualification in Dr. Ellison's treatment notes that his assessment of Baptist's functional capacity was based solely on her subjective statements. Again, "where a treating physician's opinion is

---

[4] Opinions authored by nurse practitioners are not entitled to controlling weight under the treating physician rule. *See Turner v. Astrue*, 390 Fed. Appx 581, 586 (7th Cir. 2010); 20 C.F.R. § 416.902 (effective June 13, 2011 to Mar. 26, 2017) ("Treating source means [a claimant's] physician, psychologist, or other acceptable medical source … "); 20 C.F.R. § 416.913(d) (effective Sept. 3, 2013 to Mar. 26, 2017) (listing nurse practitioner among occupations that are not "acceptable medical sources").

based on the claimant's subjective complaints, the ALJ may discount it." *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013).

The ALJ also cited Dr. Ellison's suspicions that Baptist was "malingering," or feigning her illness, as cause to discredit his and Wangard's findings. It was certainly reasonable for the ALJ to infer from these concerns regarding Baptist's credibility that any opinion based on Baptist's subjective complaints was unlikely to reflect her true functional capacity. *See Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations.").

The ALJ further found Dr. Ellison's medical source statements to be inconsistent with treatment notes—including his own—showing normal muscle strength, reflexes, sensation, and grip strength. In addition, the ALJ observed that Baptist had repeatedly denied issues with ambulation and showed no signs of muscle atrophy. These records are, indeed, inconsistent with Dr. Ellison's suggestion that Baptist could not walk or stand for more than two hours per day. *Pavlicek*, 994 F.3d at 781 (an ALJ may decline to credit a treating physician's opinion when it "is inconsistent with the physician's treatment notes"); *Karr*, 989 F.3d at 512 (ALJ properly discounted treating physician's statement that was "inconsistent with other objective evidence in the record").

Finally, the ALJ noted that the limitations outlined in Dr. Ellison's opinions were irreconcilable with the conservative treatment that he and other treating providers prescribed. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (ALJ properly relied on claimant's conservative treatment history to discount her complaints).

Taken together, these reasons provide sufficient support for the ALJ's decision to afford the opinions of Dr. Ellison and Wangard little weight. *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ may discount a treating physician's medical opinion … as long as he 'minimally articulate[s] his reasons for crediting or rejecting evidence of disability.'") (quoting *Clifford*, 227 F.3d at 870). We will not second-guess this reasoning on appeal. *See Karr*, 989 F.3d at 513 ("[W]e will not substitute our judgment for that of the ALJ's by reweighing the evidence.").

### III. CONCLUSION

ALJs are not doctors. As such, they are unqualified to interpret complex medical records or to opine as to how an impairment would limit a claimant's ability to function. Instead, they must weigh the opinions submitted by medical experts in crafting a reasonable RFC. Because the ALJ in this case did precisely that when concluding that Baptist could perform light work and because her decision is supported by substantial evidence, the denial of benefits must be upheld.

AFFIRMED.